470 F.3d 89
 Martin A. ARMSTRONG, Petitioner-Appellant,
v.
Joseph R. GUCCIONE, United States Marshal for the Southern District of New York, and Marvin D. Morrison, Warden, Metropolitan Correctional Center, Respondents-Appellees,
Alan M. Cohen, Intervenor Receiver-Appellee.
 Docket No. 04-5448-PR(L).
 Docket No. 05-0280-PR(CON).
 United States Court of Appeals, Second Circuit.
 Argued: January 24, 2006.
 Decided: November 27, 2006.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Thomas V. Sjoblom (Benjamin R. Ogletree, on the brief), Chadbourne & Parke, LLP, Washington, D.C., for Petitioner-Appellant.
 Alexander H. Southwell, Assistant United States Attorney (David N. Kelley, United States Attorney for the Southern District of New York, Karl Metzner, Assistant United States Attorney, on the brief), New York, New York, for Respondents-Appellees.
 Martin Glenn (Tancred V. Schiavoni and John J. Kim, on the brief), O'Melveny & Myers, LLP, New York, New York, for Intervenor Receiver-Appellee.
 Before: WALKER, LEVAL and SOTOMAYOR, Circuit Judges.
 Judge SOTOMAYOR concurs in a separate opinion.
 JOHN M. WALKER, JR., Circuit Judge.
 
 
 1
 It has been said that a civil contemnor who is incarcerated to compel compliance with a court order holds the key to his prison cell: Where defiance leads to the contemnor's incarceration, compliance is his salvation. In this case, petitioner-appellant Martin A. Armstrong principally argues that the key to his freedom comes at the cost of his Fifth Amendment right against compelled self-incrimination.
 
 
 2
 Armstrong, a corporate officer, refuses to fully comply with valid turnover orders, under which he has been compelled to return to a court-appointed receiver corporate records and assets totaling approximately $16 million. The United States District Court for the Southern District of New York (Richard Owen, Judge) held Armstrong in civil contempt based on his noncompliance and ordered his detention at the Metropolitan Correctional Center. Despite numerous hearings, at which the district court permitted Armstrong to either produce the missing records and assets or demonstrate that he is incapable of doing so, Armstrong continued to defy the court's directives and persisted in his assertion that, under the Fifth Amendment, he cannot be compelled to return corporate property. Armstrong eventually filed this application for a writ for habeas corpus, in which he raises numerous constitutional and statutory challenges to his confinement. He also moved for bail pending the resolution of this application. The district court issued two orders—the first denying Armstrong's bail motion and the second denying his application for habeas relief, Armstrong v. Guccione, 351 F.Supp.2d 167 (S.D.N.Y.2004)—both of which Armstrong now appeals.
 
 
 3
 The appeal presents several novel questions relating to a district court's inherent power, including whether, on the facts of this case, Congress intended to displace the district court's authority to order coercive civil confinement. We must now decide: (1) whether Armstrong's Fifth Amendment right against compelled self-incrimination protects him from being compelled by court order to produce corporate records and assets, which he holds as a custodian for the corporation; (2) whether Armstrong's detention for civil contempt violates (a) the Non-Detention Act, 18 U.S.C. § 4001(a), (b) the Recalcitrant Witness Statute, 28 U.S.C. § 1826, or (c) the Due Process Clause of the Fifth Amendment; and (3) whether the district court abused its discretion when it denied Armstrong's motion for bail pending the resolution of his habeas petition. Because we answer all of these questions in the negative, we affirm the orders of the district court.
 
 BACKGROUND
 
 4
 On September 13, 1999, Armstrong was arrested on a complaint charging him with securities fraud. The complaint alleged that Armstrong had persuaded Japanese investors to entrust approximately $3 billion to various companies controlled by him—most prominently, Princeton Economics International, Ltd. and Princeton Global Management, Ltd. (the "Princeton companies"). The investments were made on the understanding that Armstrong would invest in United States securities on behalf of the Japanese investors while hedging against any exchange-rate risk inherent in the conversion between yen and dollars. Instead, Armstrong engaged in risky and speculative trading and, as a result, lost nearly $1 billion. To hide the losses, Armstrong schemed with officers of Republic New York Securities Corporation to create fraudulent account statements and account-value confirmations that were presented to the Japanese investors. Over time, the investment program turned into a massive pyramid (Ponzi) scheme, in which Armstrong used the cash flow generated by new-investor money to pay off old investors and mask the massive investment losses.
 
 
 5
 Armstrong was charged in a twenty-four-count indictment with conspiracy to commit securities fraud, commodities fraud, and wire fraud in violation of 18 U.S.C. § 371; securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. 240.10b-5, and 18 U.S.C. § 2; and wire fraud in violation of 18 U.S.C. §§ 1341 and 2. In 2004, a superseding indictment was returned against Armstrong that expanded the scope of the previously charged conspiracy and added a count for money laundering in violation of 18 U.S.C. §§ 1957(a) and 2.
 
 
 6
 On the same day that Armstrong was arrested, September 13, 1999, the Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") instituted civil proceedings against Armstrong and the Princeton companies. SEC v. Princeton Econ. Int'l, Ltd., No. 99 Civ. 9667 (S.D.N.Y.); CFTC v. Princeton Global Mgmt., Ltd., No. 99 Civ. 9669 (S.D.N.Y.). The SEC and the CFTC immediately moved for a temporary restraining order, through which they sought to restrain Armstrong from further violating the securities laws, freeze the Princeton companies' assets, appoint a receiver to collect these assets on behalf of the companies, and require that "Armstrong and the Corporate Defendants and their officers, directors, agents, servants, employees, and attorneys-in-fact" turn over to the court-appointed receiver all corporate books, records, and "assets of the Corporate Defendants [that the defendants had] in their current possession, custody or control." The district court (Lewis A. Kaplan, Judge) granted the motions. On October 14, 1999, the district court (Richard Owen, Judge) granted the SEC's, the CFTC's, and the court-appointed receiver's motions for a preliminary injunction, which substantially continued the temporary restraining order.
 
 
 7
 Pursuant to the district court's orders, the court-appointed receiver, Alan M. Cohen, demanded that Armstrong return misappropriated corporate records and assets, including several corporate computers and approximately $16 million worth of rare coins, gold bullion bars and coins, and various antiquities. Armstrong refused to produce the misappropriated items or answer any questions concerning their whereabouts, asserting that forcing him to turn over corporate records and assets would violate his Fifth Amendment right against compelled self-incrimination.
 
 
 8
 On December 15, 1999, the receiver moved for an order holding Armstrong in contempt for refusing to give up the corporate records and assets still in his possession. The district court held a hearing on the receiver's motion on January 7, 2000. At the hearing, the receiver produced evidence in the form of declarations, invoices, shipping documents, bank records, and wire-transfer authorization letters that established that Armstrong had purchased the computers, coins, gold, and antiquities with corporate funds, and that these items were delivered to Armstrong. Armstrong did not offer any evidence in response; instead, he reiterated through counsel his argument that compliance with the court's orders would violate his Fifth Amendment right against compelled self-incrimination. At the conclusion of the hearing, the district court ruled that the Fifth Amendment did not bar the compelled production of the corporate records and assets. The district court also found, based on the evidence, that Armstrong had taken possession of, and continued to control, the corporate records and assets sought by the receiver. The district court directed Armstrong to produce the missing property. Because Armstrong's counsel represented that his client would "comply and turn over whatever he has in his possession," however, the district court held open the contempt proceedings and ordered production by January 14, 2000.
 
 
 9
 During the ensuing week, Armstrong produced approximately $1.1 million in rare coins, one computer with its hard drive conspicuously removed, three other computers, eight boxes of documents, and various antiquities, including six busts. Armstrong failed to produce a black Compaq computer, the missing computer hard drive, 102 gold bars, 699 gold bullion coins, a bust of Julius Caesar, and the remaining rare coins valued at $12.9 million. All told, Armstrong failed to return approximately $15 million in corporate assets.
 
 
 10
 On January 14, 2000, when the district court resumed proceedings, the receiver renewed his contempt motion and called several witnesses, who testified as to the missing records and assets. A forensic computer expert testified that (1) one of the four returned computers had its hard drive removed, (2) on the morning before another computer was turned over to the receiver, more than 500 files had been erased from its hard drive, and (3) on the same day that a third computer was turned over, software was installed enabling the deletion of computer files and the computer's internal clock was reset in an effort to mask the destruction of files. A second witness, a coin dealer who sold many of the missing coins to Armstrong, testified that Armstrong had produced only $1.1 million of the approximately $14 million in rare coins owned by the corporate defendants. In addition, the receiver proffered that Armstrong had failed to return several boxes of corporate records and the missing gold bars, gold bullion coins, and antiquities, including a bust of Julius Caesar.
 
 
 11
 In response to the receiver's evidence, Armstrong testified on his own behalf, "limited to the issues of compliance," but presented scant evidence to corroborate that testimony. Of the items that he had returned, Armstrong testified that he had kept some of the items "hidden in a shed in the backyard" of his mother's house and had stored other items in her house. Armstrong also stated that he had kept corporate assets—mostly antiquities—at his office at Carnegie Center in New York. Of the missing items, Armstrong neither denied that he had taken possession of these items nor contested the fact that they were purchased with corporate assets. He testified, however, that he had given the missing—and somewhat illiquid—assets to former business associates in an effort to settle past debts. Armstrong produced no evidence documenting the existence of these debts or their settlement, and he did not call a single witness to corroborate his story. Instead, Armstrong submitted a declaration from a foreign national, Nigel Kirwan, in which Kirwan stated that Armstrong agreed to pay Kirwan's trust $10 million in exchange for future revenues to be earned by a joint business venture. Kirwan did not state, however, that he actually took possession of $10 million in corporate assets from Armstrong, only that Armstrong had agreed to provide him with the money in the future.
 
 
 12
 At the conclusion of arguments, the district court found Armstrong in contempt for failing to turn over the missing records and assets. The court directed the marshals to confine Armstrong at the Metropolitan Correctional Center ("MCC") until he either complied with the turnover orders or demonstrated that it would be impossible for him to do so.
 
 
 13
 Since January 14, 2000, Armstrong has remained confined at the MCC. The district court has conducted periodic hearings to ensure that Armstrong's detention remains coercive rather than punitive. In furtherance of this end, the district court has provided Armstrong with numerous opportunities to either comply with the orders or demonstrate that it would be impossible for him to do so.
 
 
 14
 For his part, Armstrong has filed numerous interlocutory appeals from the district court's repeated determinations that his detention remains coercive. See SEC v. Armstrong ("Armstrong IV"), 88 Fed. Appx. 460 (2d Cir.2004) (per curiam) (non-precedential summary order) (dismissing the appeal for lack of appellate jurisdiction after finding that Armstrong's detention remains coercive); CFTC v. Armstrong ("Armstrong III"), 284 F.3d 404 (2d Cir. 2002) (per curiam) (same), cert. denied, 537 U.S. 864, 123 S.Ct. 260, 154 L.Ed.2d 108 (2002); SEC v. Princeton Econ. Int'l Ltd. ("Armstrong II"), 7 Fed.Appx. 65 (2d Cir. 2001) (per curiam) (non-precedential summary order) (same); see also CFTC v. Armstrong ("Armstrong I"), 269 F.3d 109 (2d Cir.2001). Each time, we held that we lacked jurisdiction over the non-final district court order and would continue to lack jurisdiction until that civil contempt order lost its coercive effect and became punitive in nature.
 
 
 15
 On February 26, 2004, in rejecting Armstrong's last interlocutory appeal on jurisdictional grounds, we invited Armstrong to submit a habeas petition as a means of having his constitutional and statutory claims addressed on the merits. See Armstrong IV, 88 Fed.Appx. at 462. "We base[d][our] decision, in part, on [the] belief that a ruling squarely addressing the merits of Armstrong's arguments [would] streamline the ultimate resolution of this case." Id. We also have stated our belief that Armstrong's incarceration will only become more coercive once his "various appeals and petitions for extraordinary relief" are finally put to rest. Armstrong III, 284 F.3d at 406.
 
 
 16
 On August 23, 2004, six months after we suggested that Armstrong seek collateral relief, Armstrong filed with the district court a petition for a writ of habeas corpus. Armstrong's petition sought relief on two principal grounds: that his continued detention for non-production of the missing records and assets violates his Fifth Amendment right against compelled self-incrimination, and that the district court lacks authority to incarcerate him for civil contempt.
 
 
 17
 On September 23, 2004, the district court held a conference to set a briefing schedule and a hearing date for the petition. At the end of the conference, Armstrong sought bail pending the resolution of his habeas petition. The district court denied the motion.
 
 
 18
 On October 12, 2004, Armstrong appealed the denial of his motion for bail pending the district court's review of his habeas petition. That appeal is currently before us. Two days later, Armstrong separately moved this court for bail, which we denied in a December 7, 2004, order.
 
 
 19
 On December 23, 2004, the district court denied Armstrong's habeas petition. Armstrong v. Guccione, 351 F.Supp.2d 167 (S.D.N.Y.2004). It found that, under Braswell v. United States, 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), Armstrong cannot assert a Fifth Amendment right against the compelled production of corporate records and assets. 351 F.Supp.2d at 173. The district court also rejected Armstrong's contention that it lacked the authority to keep him incarcerated as a civil contemnor. Id. at 171 & n. 7, 173.
 
 
 20
 On January 11, 2005, Armstrong filed a notice of appeal from the district court's December 23, 2004, decision. We consolidated this appeal with Armstrong's separate appeal from the district court's order denying bail.
 
 
 21
 On January 24, 2006, we heard oral argument in these appeals. Thereafter, on August 17, 2006, Armstrong pled guilty to conspiracy to commit securities, mail, and wire fraud and awaits sentencing. Armstrong's challenge to the lawfulness of his civil confinement, however, which stems from his refusal to comply with orders entered in the civil proceedings against his companies, remains before us.
 
 DISCUSSION
 
 22
 The district court had subject matter jurisdiction over Armstrong's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. We have jurisdiction to entertain his appeal pursuant to 28 U.S.C. § 2253(a).
 
 
 23
 We review de novo the denial of an application for a writ of habeas corpus brought pursuant to § 2241. See Rankine v. Reno, 319 F.3d 93, 98 (2d Cir.2003). Our review of the denial of bail in a habeas corpus proceeding is deferential; we "must accord a presumption of correctness to the initial custody determination made" by the district court. Hilton v. Braunskill, 481 U.S. 770, 777, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); see also Fed. R.App. P. 23(d) (stating that, in a habeas proceeding, the district court's initial bail determination will not be set aside absent "special reasons shown to the court of appeals").
 
 
 24
 Armstrong attacks his confinement on three fronts. First, Armstrong argues that his incarceration contravenes his Fifth Amendment right against compelled self-incrimination notwithstanding that he has been ordered to return corporate property. Second, he argues that his continued detention violates (a) the Non-Detention Act, (b) the Recalcitrant Witness Statute, and (c) the Due Process Clause of the Fifth Amendment. Finally, Armstrong argues that the district court abused its discretion by denying him bail pending the resolution of his habeas petition.
 
 I. Compelled Self-Incrimination
 
 25
 Armstrong's principal contention all along—throughout his contempt hearings and supporting his habeas petition—has been that the forced production of corporate records and assets violates his Fifth Amendment right against compelled self-incrimination. He has refused to comply with the district court's orders, asserting instead his own understanding of the law: "My position is I don't have to [comply]." The law, however, is otherwise.
 
 
 26
 In Braswell v. United States, the Supreme Court held that a corporate custodian could not invoke the Fifth Amendment as a basis for refusing to produce corporate records, even though the act of producing those records has independent testimonial significance, which might incriminate the custodian personally. 487 U.S. 99, 109-10, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988). The Court reached this holding based, in part, on the collective entity rule, which provides that a collective entity is beyond the protection of the Fifth Amendment. See, e.g., United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542 (1944) (upholding an order of contempt against a union representative for refusing to produce union records because the official held the records in a representative capacity and the Fifth Amendment privilege applies only to natural persons). As the Braswell Court explained:
 
 
 27
 [T]he custodian of corporate or entity records holds those documents in a representative rather than a personal capacity. Artificial entities such as corporations may act only through their agents, and a custodian's assumption of his representative capacity leads to certain obligations, including the duty to produce corporate records on proper demand by the Government. Under those circumstances, the custodian's act of production is not deemed a personal act, but rather an act of the corporation. Any claim of Fifth Amendment privilege asserted by the agent would be tantamount to a claim of privilege by the corporation—which of course possesses no such privilege.
 
 
 28
 487 U.S. at 109-10, 108 S.Ct. 2284 (citation omitted).
 
 
 29
 Although a corporate custodian is not entitled to raise the Fifth Amendment as a shield to the production of corporate records and property, Braswell established a "mitigating evidentiary privilege" to reduce the risk that the custodian's act of production would be attributed to him personally. Id. at 117-18, 108 S.Ct. 2284. Thus, "in a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by . . . the custodian." Id. at 118, 108 S.Ct. 2284.
 
 
 30
 Braswell controls here. The district court found that Armstrong is a corporate officer in possession of records and assets of the Princeton companies. Accordingly, he can be compelled to produce the companies' records and assets; he cannot escape production by relying on the Fifth Amendment.
 
 
 31
 Undeterred by what is a routine application of Braswell, Armstrong goes to considerable lengths to attempt to get out from under the decisive weight of its holding. Armstrong argues that Braswell does not apply post-indictment; that "[t]he reasoning of Braswell has been called into question by the Supreme Court's decision in" United States v. Hubbell, 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000); and, finally, that his contempt order rests on error because the district court "misapplied Braswell to the facts in this case." None of these arguments has merit.
 
 
 32
 First, nothing in Braswell limits its application to unindicted corporate custodians. Braswell fully anticipated that the government might pursue criminal charges against the person claiming a Fifth Amendment privilege when it established the mitigating evidentiary privilege. Braswell, 487 U.S. at 117-18, 108 S.Ct. 2284. There is no basis to believe that the Court's assessment of a custodian's Fifth Amendment interests changes after that custodian is indicted. The Supreme Court's Fifth Amendment jurisprudence teaches that an individual's right against compelled self-incrimination, to the extent that he or she enjoys such a right, is equally pressing pre- and post-indictment. In any event, the decision in Braswell did not involve weighing the custodian's personal interests; it held that a custodian for a corporation "may not resist a subpoena for corporate records on Fifth Amendment grounds." See id. at 113, 108 S.Ct. 2284. The rule announced in Braswell applies with equal force before and after a custodian is indicted.
 
 
 33
 Second, we reject any suggestion that Hubbell so undermined Braswell that we are no longer compelled to follow its holding. Hubbell recognized that the compelled production of documents can be testimonial to the extent that such production communicates a statement of fact—for example, that requested "papers existed, were in [the individual's] possession or control, and were authentic." Hubbell, 530 U.S. at 36, 120 S.Ct. 2037 (quotation marks omitted); see also id. at 41-42, 120 S.Ct. 2037. Braswell is not wholly inconsistent with Hubbell. Braswell recognized that a custodian's act of production on behalf of a corporation can be testimonial; it established an evidentiary privilege to prevent the government from using the custodian's act of production in a subsequent criminal proceeding against the custodian. Braswell, 487 U.S. at 117-18, 108 S.Ct. 2284. We remain bound by the Supreme Court's holding in Braswell.
 
 
 34
 Finally, we reject Armstrong's assertion that the district court misapplied Braswell. This assertion is based on two distinct arguments: that (a) Armstrong's case does not fit within Braswell because he is no longer a corporate custodian, and (b) in any event, the district court exceeded its authority under Braswell because, if Armstrong failed to comply with the turnover orders, he could avoid a finding of contempt only by demonstrating that compliance with the orders would prove impossible. Neither argument has merit.
 
 
 35
 Armstrong argues that he is no longer a custodian because, when the district court ordered the production of corporate records and assets, it also appointed a receiver, which, according to Armstrong, "stripped [Armstrong] of all authority over the Corporate Defendants." Armstrong thus argues that his case falls outside the rule announced in Braswell. Instead, he argues that his status is more akin to that of a former employee. And he relies on In re Three Grand Jury Subpoenas Duces Tecum Dated January 29, 1999, 191 F.3d 173 (2d Cir.1999), in which we held that former employees were no longer custodians of their former employer and thus could assert a Fifth Amendment privilege in response to subpoenas, which were served after the employees resigned from the company but sought to compel the production of corporate property that remained in the former employees' possession.
 
 
 36
 We have little difficulty concluding that, on the day that the turnover order was entered, Armstrong was an officer of the Princeton companies and a custodian of corporate property. The appointment of the receiver did not eliminate Armstrong's custodial duties and it did not sever his relationship with the companies. In fact, the district court specifically found that, "although Mr. Martin Armstrong . . . may not have the power that he had once upon a time, he is still a custodian and officer . . . of the various corporations that [own] this property." There is no basis for setting aside this finding. Armstrong's case is governed by Braswell, not In re Three Grand Jury Subpoenas.
 
 
 37
 We likewise reject Armstrong's argument that the district court exceeded its authority under Braswell when it recognized that, in order to set aside the contempt order, Armstrong bore the burden of demonstrating that compliance with the turnover orders would prove impossible. In pursuing this argument, Armstrong suggests that the district court held him in contempt for refusing to testify as to the whereabouts of the missing corporate property. This suggestion distorts reality.
 
 
 38
 At the January 7, 2000, hearing, the district court determined that Armstrong could not assert a Fifth Amendment privilege against the compelled production of the missing corporate property. The district court, however, stayed the contempt proceedings and ordered production by January 14, 2000, because Armstrong's counsel indicated that his client would "comply and turn over whatever he has in his possession." In response, the district court warned that, in order to avoid a future finding of contempt at the January 14 hearing, Armstrong would have to either produce the missing property or demonstrate that compliance is impossible. See Appx. 493 (Jan. 7, 2000, hearing) ("I am observing now to Mr. Armstrong and his lawyers that if there is nonproduction of any of the items that have been listed by the court as having been demonstrated to be producible by him, if there is nonproduction, I'm going to want a competent explanation." (emphasis added)).
 
 
 39
 At the January 14, 2000, hearing, when Armstrong failed to produce all of the missing items, the district court found him in contempt for refusing to turn over the missing corporate property; the court did not find him in contempt based on any refusal to testify. See Appx. 668 (Jan. 14, 2000, hearing) ("Mr. Armstrong, I am finding you in civil contempt for failure to produce a lot of stuff."); see also SEC v. Princeton Econ. Int'l, Ltd., 294 F.Supp.2d 550, 551 (S.D.N.Y.2003) ("Mr. Armstrong is being asked to turn over property, not to provide any testimony.").
 
 
 40
 The district court's statements and actions reflect a proper understanding of the law. Although Armstrong may not assert a Fifth Amendment privilege in response to the turnover orders, Braswell, 487 U.S. at 109-10, 108 S.Ct. 2284, he could have avoided a finding of contempt—and can still have the contempt order set aside—by demonstrating that compliance with the turnover orders is presently impossible, see United States v. Rylander, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983). As the Supreme Court explained in Rylander:
 
 
 41
 In a civil contempt proceeding . . ., a defendant may assert a present inability to comply with the order in question. Maggio v. Zeitz, 333 U.S. 56, 75-76, 68 S.Ct. 401, 92 L.Ed. 476 (1948). While the court [will not relitigate the basis upon which an] enforcement order [rests], it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising [the] defense [of impossibility], the defendant has a burden of production.
 
 
 42
 460 U.S. at 757, 103 S.Ct. 1548 (citation altered and citations omitted).
 
 
 43
 Although Armstrong has no Fifth Amendment right to refuse to produce the property, he does retain the right to refuse to testify as to the whereabouts of the missing corporate property. Curcio v. United States, 354 U.S. 118, 128, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); United States v. Edgerton, 734 F.2d 913, 920 (2d Cir. 1984). This testimonial privilege, however, does not relieve him of his burden to demonstrate a present inability to comply with the turnover orders. Rylander, 460 U.S. at 758, 103 S.Ct. 1548. Thus, the burden to demonstrate impossibility remains at all times on Armstrong, even though he cannot be compelled to take the witness stand at a compliance hearing.
 
 
 44
 The district court did not force Armstrong to take the witness stand; instead, the court recognized that if Armstrong failed to produce the missing items, he could avoid a finding of contempt only by demonstrating that compliance is impossible. See Appx. 493-94. Armstrong was subsequently held in contempt because he neither complied with the turnover orders nor demonstrated that such compliance is impossible. See id. at 668, 671; see also Rylander, 460 U.S. at 761, 103 S.Ct. 1548 ("Rylander is thus not compelled to submit to incarceration, or run the risk of incriminating himself; he is committed until he either produces the documents which the District Court found to be in his possession, or adduces evidence as to his present inability to comply with that order." (citation and internal quotation marks omitted)).
 
 
 45
 Lest there be any misunderstanding based on Armstrong's assertions, his self-incrimination arguments are without merit; the district court's contempt order does not rest on an erroneous application of the Fifth Amendment's Compelled Self-incrimination Clause.
 
 II. Detention Authority
 
 46
 Armstrong argues that, even if he was lawfully held in contempt, the district court's authority to detain him expired long ago. Specifically, he claims that his continued confinement, now approaching seven years, violates the Non-Detention Act, the Recalcitrant Witness Statute, and the Due Process Clause of the Fifth Amendment.
 
 
 47
 In making these arguments, Armstrong acknowledges that district courts were formerly vested with certain inherent powers, including the power to order coercive civil confinement. Armstrong argues that the Non-Detention Act eliminated the power of the lower federal courts to incarcerate for civil contempt; that if that power survived, the Recalcitrant Witness Statute limited confinement to a maximum duration of eighteen months; and that in any event the duration of his confinement exceeds what is permissible under the Due Process Clause. Before we address these arguments, however, it is important to understand the baseline authority that the district court has invoked: an inherent authority to order coercive civil confinement.
 
 
 48
 The Supreme Court has long recognized that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution." United States v. Hudson, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). "The most prominent of these is the contempt sanction, which a judge must have and exercise in protecting the due and orderly administration of justice and in maintaining the authority and dignity of the court." Roadway Express, Inc. v. Piper, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980) (quotation marks omitted); see also In re Debs, 158 U.S. 564, 595, 15 S.Ct. 900, 39 L.Ed. 1092 (1895), abrogated on other grounds by Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968) ("`The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a necessary incident and attribute of a court, without which it could no more exist than without a judge.'" (quoting Watson v. Williams, 36 Miss. 331, 341 (Miss.Err. & App.1858))); Sigety v. Abrams, 632 F.2d 969, 976 (2d Cir.1980) (quoting the same). "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." Ex parte Robinson, 86 U.S. (19 Wall.) 505, 510, 22 L.Ed. 205 (1874); see also Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 227, 5 L.Ed. 242 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates."); NASCO, Inc. v. Calcasieu Television & Radio, Inc., 894 F.2d 696, 702 (5th Cir.1990), aff'd sub nom., Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).
 
 
 49
 Modern courts distinguish between two forms of contempt: civil and criminal. See, e.g., Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (the lead case analyzing the differences between the two kinds of contempt); see also Int'l Union, United Mine Workers of Am. v. Bagwell, 512 U.S. 821, 826-30, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (discussing the differences between the two forms of contempt).
 
 
 50
 The chief characteristic of civil contempt is that its purpose is to compel obedience to an order of the court to enforce the rights of the other party to the action. Consistent with this remedial purpose, the sanction imposed is generally made contingent on compliance. This is often accomplished by a purgation provision, whereby a civil contemnor may purge himself of contempt at any time by compliance. The purpose of an order of criminal contempt, on the other hand, is punitive. It is imposed to vindicate the court's authority. Accordingly, compliance with the court's command will not lift the sanction.
 
 
 51
 In re Irving, 600 F.2d 1027, 1031 (2d Cir. 1979) (citations omitted); see also Simkin v. United States, 715 F.2d 34, 36-37 (2d Cir.1983).
 
 
 52
 Thus, "[t]he paradigmatic coercive, civil contempt sanction . . . involves confining a contemnor indefinitely until he complies with an affirmative command such as an order to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance." Bagwell, 512 U.S. at 828, 114 S.Ct. 2552 (citation and quotation marks omitted). The phrase "indefinitely until he complies," however, is not quite as absolute as the use of the term "indefinitely" might suggest. A contemnor can, for example, secure his freedom, without complying, if he demonstrates that there is "no wilful disobedience but only an incapacity to comply." Maggio, 333 U.S. at 74, 68 S.Ct. 401; see also Rylander, 460 U.S. at 757, 761, 103 S.Ct. 1548.
 
 
 53
 In Shillitani v. United States, the Supreme Court stated: "There can be no question that courts have inherent power to enforce compliance with their lawful order through civil contempt." 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); cf. Sigety, 632 F.2d at 976 (quoting the same in support of a state court's authority to confine for civil contempt). Thus, we have little difficulty concluding that the district court's inherent power to order coercive civil confinement is of ancient and traditional origins. Armstrong's statutory arguments, however, present the question whether the district court still retains this power.
 
 
 54
 The lower federal courts are creatures of statute. Thus, "the exercise of the inherent power of lower federal courts can be limited by statute and rule." Chambers v. NASCO, Inc., 501 U.S. 32, 47, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). "Nevertheless," the Supreme Court explained, "we do not lightly assume that Congress has intended to depart from established principles such as the scope of a court's inherent power." Id. (quotation marks omitted). The Supreme Court also has explained that a formal sanctioning system, established by statute or rule, does not necessarily displace the courts' inherent power to sanction for contemptuous conduct "simply because that conduct could also be sanctioned under the statute or [rule at issue]." Id. at 50, 111 S.Ct. 2123; see also id. at 46, 49, 111 S.Ct. 2123. Thus, it is possible for statutory and inherent sources of judicial authority to coexist.
 
 
 55
 For Congress to displace or repudiate the lower federal courts' inherent powers, the Supreme Court has demanded something akin to a clear indication of legislative intent. See, e.g., id. at 47, 111 S.Ct. 2123.[1] The Supreme Court has suggested that an indication of legislative intent need not be explicit in order to be clear: "`Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's [authority] in equity, the full scope of that [authority] is to be recognized and applied.'" Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946)) (emphasis added). As a result, it appears that Congress may restrict the courts' inherent powers by "inference," but only where such an inference is "necessary and inescapable." Id. In the absence of a clear indication, whether express or implied, the Supreme Court has "resolve[d] ambiguities [in the statute or rule at issue] in favor of that interpretation which affords a full opportunity for ... courts to [act] in accordance with their traditional practices." Hecht Co. v. Bowles, 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944); see also Weinberger, 456 U.S. at 320, 102 S.Ct. 1798 (quoting the same passage from Hecht). With these principles in mind, we turn to Armstrong's arguments that Congress intended to limit the lower federal courts' inherent power to order coercive civil confinement.
 
 A. Non-Detention Act
 
 56
 Armstrong argues that, through the passage of the Non-Detention Act, 18 U.S.C. § 4001(a), Congress eliminated the lower federal courts' inherent power to order coercive civil confinement. The Act, which grew out of a desire to prohibit unauthorized executive detention, provides: "No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress." 18 U.S.C. § 4001(a).
 
 
 57
 According to Armstrong, "[the Recalcitrant Witness Statute] is the only statute in the United States Code . . . authorizing coercive detention [for contemptuous conduct before or ancillary to] court proceedings." Because his detention has exceeded the duration permitted under that statute, Armstrong argues that he is being held in violation of the Non-Detention Act. We disagree.
 
 
 58
 We hold that the Non-Detention Act is not an obstacle to Armstrong's detention for the purpose of securing his compliance with the district court's order to produce the corporation's assets. Assuming that the Non-Detention Act has any application to coercive confinement in the face of a finding of civil contempt—a point we need not decide—the Judiciary Act of 1789, which established the lower federal courts, provides sufficient statutory authorization to satisfy any requirement of the Non-Detention Act. The power to confine to coerce compliance with court orders is such a fundamental and well-established incident of judicial power that, in creating the lower federal courts, Congress implicitly vested them with that power. Although it is unnecessary to decide this additional point, we note that there is every reason to think that the requirements of the Non-Detention Act are also satisfied by 18 U.S.C. § 401, which should be understood to authorize imprisonment on findings of both civil and criminal contempt.
 
 
 59
 1. In establishing the lower federal courts, Congress vested in them the inherent power to order coercive civil confinement.
 
 
 60
 Although the courts' inherent powers do not draw from any specific grant of statutory authority, Hudson, 11 U.S. (7 Cranch) at 34 (stating that inherent powers are "not immediately derived from statute" (emphasis added)); see also Link, 370 U.S. at 630-31, 82 S.Ct. 1386, they nevertheless owe their existence to the statutes which established the lower federal courts, Robinson, 86 U.S. (19 Wall.) at 510 ("The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power."). For this reason, "`Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.'" Chambers, 501 U.S. at 43, 111 S.Ct. 2123 (quoting Anderson, 19 U.S. (6 Wheat.) at 227). We conclude that these organic statutes are sufficient to satisfy the Non-Detention Act's statutory authorization requirement.
 
 
 61
 When Congress established the lower federal courts and vested them with the "judicial Power of the United States," U.S. Const. art. III, § 1, it was not operating in a vacuum. The "judicial Power" consisted of all the inherent powers of the courts of justice necessary to their functioning and naturally included the power to enforce their orders through contempt. In the years immediately preceding our Nation's founding, the contempt power was acknowledged to be "as ancient as the laws themselves." William Blackstone, 4 Commentaries *282. In his influential Commentaries, Blackstone also made the case for this inherent contempt power:
 
 
 62
 [The] laws, without a competent authority to secure their administration from disobedience and contempt, would be vain and nugatory. A power therefore in the supreme courts of justice to suppress such contempts, by an immediate attachment of the offender, results from first principles of judicial establishments, and must be an inseparable attendant upon every superior tribunal.
 
 
 63
 Id. Scholars of a more recent vintage have traced the exercise of the contempt power to as early as the twelfth century. See, e.g., Joseph H. Beale, Jr., Contempt of Court, Criminal and Civil, 21 Harv. L.Rev. 161, 164 (1908) (explaining that "[i]n the time of Henry II [who reigned from 1154-1189] it was laid down that if a tenant duly summoned in the court was absent, the king or his justices might at their pleasure punish him for his contempt of court" (footnote omitted)).
 
 
 64
 The contempt power that Blackstone described in his Commentaries, however, was not limited to what we now describe as punitive or criminal contempt, but included also the coercive power now described as civil contempt. See William Blackstone, 3 Commentaries *443-45 (stating that if a civil defendant failed to appear when summoned, he would be held in "contempt" and was subject to a writ of attachment, which could lead to his "commit[ment] to the fleet, or other prison, till he puts in his appearance, or answer, or performs whatever else [the court's] process is issued to enforce"); see also id. at *445 (explaining that "the same kind of process is issued out in all sorts of contempts during the progress of the cause, if the parties in any point refuse or neglect to obey the order of the court"). Remedial or coercive civil contempt was employed as early as the fifteenth century. See Beale, supra, at 169-70 ("As early as the time of Richard III [who reigned from 1483-1485] it was said that the chancellor of England compels a party against whom an order is issued by imprisonment; and a little later it was said in the chancery that `a decree does not bind the right, but only binds the person to obedience, so that if the party will not obey, then the chancellor may commit him to prison till he obey ....'" (footnotes omitted)); cf. David Eady & A.T.H. Smith, Aldridge, Eady & Smith on Contempt, § 1-47, at 15 (2d ed.1999) (noting that, in cases reported between 1557-1604, English Chancery courts would compel obedience to their orders through imprisonment); see also Ex parte Grossman, 267 U.S. 87, 111, 121, 45 S.Ct. 332, 69 L.Ed. 527 (1925) (explaining that, long before the time of our Constitution, the law of contempt recognized a remedial or coercive component "necessary to secure the rights of the injured suitor").
 
 
 65
 Armstrong's principal objection to our conclusion—that Congress, through the creation of lower federal courts, authorized coercive confinement in the face of civil contempt—is that the inherent powers are not explicitly authorized by statute. In our view, however, that does not render the existence of such powers any less an incident of legislative grace. The inferior federal courts are entirely creatures of statute; through their establishment by the Judiciary Act of 1789, they were invested with "[t]he judicial Power of the United States" as authorized by the Constitution. U.S. Const. art. III, § 1; see also id. art. I, § 8, cl. 9 (authorizing Congress to "constitute Tribunals inferior to the supreme Court"). Because the power to enforce its decrees by confinement in cases of disobedience has long been generally understood to be an attribute of judicial power, the legislation that established the lower federal courts implicitly vested those courts with that attribute. In the event the Non-Detention Act applies to a federal court's power to enforce its orders by confinement, the enactment establishing those courts satisfied its requirement of a statute of Congress.[2]
 
 
 66
 2. Congress also specifically authorized indefinite, coercive civil confinement.
 
 
 67
 Although the statutory creation of the federal courts is sufficient to meet the requirements of the Non-Detention Act, there is also every reason to believe that in addition to the Judiciary Act of 1789, Congress specifically authorized indefinite, coercive civil confinement through the enactment of the provision now codified at 18 U.S.C. § 401.
 
 Section 401 provides:
 
 68
 A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
 
 
 69
 (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
 
 
 70
 (2) Misbehavior of any of its officers in their official transactions;
 
 
 71
 (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.
 
 
 72
 18 U.S.C. § 401. Armstrong's contempt would appear to fall within the third category of contempt. See 18 U.S.C. § 401(3).
 
 
 73
 Armstrong argues that because this provision uses the word "punish," it "has nothing to do with civil contempt, only criminal contempt." However, § 401's use of the term "punish" must be viewed in the context of its predecessor statutes, which plainly included within the meaning of "punish" a court's coercive civil contempt power, as well as the power to sanction a contemnor criminally.
 
 
 74
 The Judiciary Act of 1789 expressly granted the lower federal courts the "power . . . to punish by fine or imprisonment, at the discretion of said courts, all contempts of authority in any cause or hearing before the same." ch. 20, § 17, 1 Stat. 73, 83. In reference to this enactment, the Supreme Court has explained that "the question whether particular acts constituted a contempt, as well as the mode of proceeding against the offender, was left to be determined according to ... established rules and principles of the common law." Ex parte Savin, 131 U.S. 267, 275-76, 9 S.Ct. 699, 33 L.Ed. 150 (1889). Until the nineteenth century, English courts did not distinguish between the criminal contempt power and the power to order coercive civil confinement, the latter of which the courts of England had utilized since the fifteenth century. See Beale, supra, at 167-70; see also Grossman, 267 U.S. at 111, 121, 45 S.Ct. 332; cf. Eady & Smith, supra, § 1-47, at 15.
 
 
 75
 The Supreme Court of the United States did not recognize this distinction between criminal and civil contempt until the end of the nineteenth century, see Beale, supra, at 168, and continued to speak in terms of "punishment" with regard to both even after drawing that distinction:
 
 
 76
 It is not the fact of punishment, but rather its character and purpose, that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court.
 
 
 77
 Gompers, 221 U.S. at 441, 31 S.Ct. 492 (emphasis added); see also Lamb v. Cramer, 285 U.S. 217, 220, 52 S.Ct. 315, 76 L.Ed. 715 (1932) (using the term "punish" to describe the civil contempt sanction); McCann v. N.Y. Stock Exch., 80 F.2d 211, 215 (2d Cir.1935) (L.Hand, J.) (describing civil contempt as "a remedial punishment").
 
 
 78
 In 1831, Congress first enacted the statute that restricted the circumstances under which contempt sanctions could be employed—restrictions that today are embodied in 18 U.S.C. § 401—without drawing any distinction between criminal and civil contempt sanctions. The triggering event was an infamous incident in which a judge summarily imprisoned and suspended an attorney for writing an article critical of one of the judge's opinions.[3] Section 1 of the Act of March 2, 1831, styled as "declaratory of the law concerning contempts of court," provided:
 
 
 79
 That the power of the several courts of the United States to issue attachments and inflict summary punishments for contempts of court, shall not be construed to extend to any cases except [1] the misbehaviour of any person or persons in the presence of the said courts, or so near thereto as to obstruct the administration of justice, [2] the misbehaviour of any of the officers of the said courts in their official transactions, and [3] the disobedience or resistance by any persons, to any lawful writ, process, order, rule, decree, or command of the said courts.
 
 
 80
 ch. 99, § 1, 4 Stat. 487, 487-88. This provision was eventually combined with the 1789 provision to form section 725 of the Revised Statutes—a byproduct of the codification efforts of the 1870s. See Rev. Stat. § 725 (1875).[4]
 
 
 81
 Revised Statute § 725 continued to use the term "punish" without distinguishing between coercive civil and criminal contempt sanctions. With reference to this statute—which had been in force since December 1, 1873, United States v. Gillis, 95 U.S. 407, 409, 24 L.Ed. 503 (1877)—the Supreme Court in In re Chiles, 89 U.S. (22 Wall.) 157, 168, 22 L.Ed. 819 (1874), stated:
 
 
 82
 Section 725 of the Revised Statutes declares that the courts of the United States shall have power to punish by fine and imprisonment for contempts of their authority. And among the cases specially enumerated are "disobedience or resistance by any officer of the court, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts." Such has always been the power of the courts both of common law and equity. The exercise of this power has a two-fold aspect, namely: first, the proper punishment of the guilty party for his disrespect to the court or its order, and the second, to compel his performance of some act or duty required of him by the court, which he refuses to perform.
 
 
 83
 In the former case, the court must judge for itself the nature and extent of the punishment, with reference to the gravity of the offence. In the latter case, the party refusing to obey should be fined and imprisoned until he performs the act required of him or shows that it is not in his power to do it.
 
 
 84
 Id. (footnote omitted) (emphasis added).
 
 
 85
 Section 268 of the Judicial Code of 1911 reiterated Revised Statute § 725. See Act of March 3, 1911, ch. 231, § 268, 36 Stat. 1087, 1163 (later codified at 28 U.S.C. § 385 (1926)). The Act of 1911 did not alter the terms of the contempt power in any material respect; it continued to authorize the courts to "punish [contempts of their authority] by fine and imprisonment," and it continued to limit the exercise of that power to the three classes of contempts first identified by Congress in the Act of 1831. Id.[5]
 
 
 86
 In 1948, Congress relocated the latest iteration of the contempt statute, § 401, in Title 18 of the United States Code, the home of most criminal statutes. The move did not alter the terms of the statute in any material respect from section 268 of the Judicial Code of 1911. There is no indication from § 401's text or legislative history that the incorporation of the provision into Title 18 was intended by Congress to abrogate the statutory authorization of the coercive civil contempt power that had existed since 1789 and had been maintained in the embodiments of 1831, 1875, and 1911.
 
 
 87
 Throughout the history of § 401's predecessor statutes, the term "punish" has been used indiscriminately to refer to civil and criminal contempt sanctions alike. Thus, the statutory use of the term "punish" at a time when the law drew no distinction between civil and criminal contempt sanctions, and its continued use in statutes to apply to both after the law recognized the distinction, can only lead to the conclusion that the judicial power to invoke coercive contempt sanctions is statutorily authorized by § 401 and is therefore not barred by the Non-Detention Act.
 
 B. Recalcitrant Witness Statute
 
 88
 Armstrong contends that his confinement for refusing to comply with the court's production order falls under the terms of 28 U.S.C. § 1826(a), and that he must be released because his confinement has continued beyond the eighteen-month maximum period of confinement allowed by that statute. Section 1826(a) authorizes a court to order coercive civil confinement of a "recalcitrant witness" for up to eighteen months where such a "witness[,] in any proceeding before or ancillary to any court or grand jury of the United States[,] refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record, recording or other material."
 
 
 89
 In support of his claim that he is protected by the statute's eighteen-month cap, Armstrong argues that, under the reasoning of United States v. Hubbell, 530 U.S. 27, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000), his compelled production makes him a "witness" under the Fifth Amendment because his production of the assets of the corporation could be used in a criminal prosecution to show his criminal possession of those assets. The Supreme Court in Hubbell reasoned that the act of production itself may implicitly communicate statements of fact, such as the witness's admission that the documents existed and were in his possession and control. Because that implicit admission could be used in a criminal prosecution against the person producing the documents, for such purposes as proving his wrongful possession of them, the Supreme Court concluded that production of documents would be testimonial and protected by the Fifth Amendment. Armstrong argues that, based on the same line of reasoning, he should be considered a "witness under § 1826(a) because he is being `called upon to perform a testimonial act.'" His argument is misplaced.
 
 
 90
 First, Armstrong is not a "witness" under the Fifth Amendment. The reasoning of Hubbell was not addressed to the circumstances of a custodian of corporate property who is directed to disgorge it. As explained above, the circumstance of the custodian of corporate property is covered by the Supreme Court's earlier ruling in Braswell. Braswell made plain that, while a custodian of corporate property may not invoke Fifth Amendment protection against compelled production of the corporation's property, he is protected against the use of his compelled production as evidence to show that he possessed the property. Braswell, 487 U.S. at 118, 108 S.Ct. 2284 ("In a criminal prosecution against the custodian, the Government may not introduce into evidence before the jury the fact that the subpoena was served upon and the corporation's documents were delivered by . . . the custodian."). In other words, the very reasoning of Hubbell on which Armstrong relies to demonstrate that he is a "witness" did not disturb Braswell's holding with respect to custodians of corporate property.
 
 
 91
 Furthermore, § 1826(a) requires more than that the contemnor be a witness. The statute applies only to a witness who "refuses without just cause shown to comply with an order of the court to testify or provide other information." 28 U.S.C. § 1826(a); see also S.Rep. No. 91-617, at 57 (1969) (stating that the statute was intended "to deal with witnesses who are unlawfully withholding information necessary to move forward an investigation"). Armstrong relies on the Sixth Circuit's ruling in United States v. Mitchell, 556 F.2d 371 (6th Cir.1977), to establish that his refusal to comply with the court's order was a refusal to provide information falling within the scope of § 1826(a). His argument fails. In Mitchell, two indicted defendants were directed by the court to furnish voice exemplars. They had no right under the Fifth Amendment to refuse the order because the giving of voice exemplars is not considered being "a witness against [one]self," as it is not a testimonial act. Id. at 382. The defendants refused to give the exemplars, and after a hearing at which the defendants testified to "their reasons for opposing the order," id. at 381, they were found to be in civil contempt and were confined to coercive confinement. The Sixth Circuit determined that the confinement in excess of eighteen months violated § 1826(a). The court concluded that the order to produce voice exemplars was an order to "provide . . . information" under the terms of § 1826(a), with the consequence that the defendants were protected by the statute's eighteen-month limitation.[6] In defending the appeal, the government argued that § 1826(a) did not apply because it protected only "witnesses," and the defendants did not fall within that category because they were defendants. The court rejected that contention. The defendants were "in fact acting as `witnesses' when directed to produce the information, even though the non-testimonial nature of the evidence makes Fifth Amendment protections inapplicable." Id.
 
 
 92
 Armstrong contends that the reasoning of Mitchell compels the conclusion that the refusal to produce under a court order falls under § 1826(a). His argument is without merit. In order to come within the terms of § 1826(a), a witness must refuse to testify "or provide other information." 28 U.S.C. § 1826(a). The court in Mitchell concluded that the furnishing of a voice exemplar constituted providing "other information" as specified by the statute, see Mitchell, 556 F.2d at 384-85, presumably because the voice exemplars were sought for their informational content and had no other value, see Palmer v. United States, 530 F.2d 787, 789 (8th Cir.1987) (explaining that the ordered production of handwriting exemplars falls under § 1826(a) because "[t]he phrase [`other information'] . . . would include . . . electronically stored information or computer tapes [and] is intended to be comprehensive, including all information given as testimony, but not orally"). By contrast, the order which Armstrong refused to obey commands the production of gold bullion, valuable coins, and antiquities that are sought not because of any information they might contain, but because they are objects of monetary value that are the property of the corporation in receivership. An order requiring the production of money or valuable property, for the purpose of restoring it to its rightful owner, is not an order to provide "information," and does not fall under the terms of § 1826(a).
 
 
 93
 To be sure, the production order also directs Armstrong to produce a computer hard drive, which presumably contains records of the Princeton funds. If Armstrong were being confined solely because of his refusal to produce the computer files, we would need to consider whether the eighteen-month cap of § 1826(a) applies. But until Armstrong produces the gold and the valuable coins and antiquities he is withholding, that issue is a moot point. His confinement by reason of his contumacious refusal to produce the objects of monetary value does not come within § 1826(a) and is not subject to its eighteen-month limitation.
 
 C. Fifth Amendment Due Process Clause
 
 94
 We are left with Armstrong's only remaining challenge to his continued confinement: the Due Process Clause of the Fifth Amendment. Armstrong appears to assert that, simply by the nature of its length, his detention offends the Fifth Amendment. He also asserts that the Recalcitrant Witness Statute established a legislative presumption that confinement beyond eighteen months offends the Due Process Clause. We reject both assertions.
 
 
 95
 The length of coercive incarceration, in and of itself, is not dispositive of its lawfulness. The Supreme Court has stated that a court may jail a contemnor "indefinitely until he complies," Bagwell, 512 U.S. at 828, 114 S.Ct. 2552 (emphasis added), or until he establishes that compliance is no longer possible, Rylander, 460 U.S. at 757, 761, 103 S.Ct. 1548; see Maggio, 333 U.S. at 74, 68 S.Ct. 401. Civil confinement only becomes punitive when it loses the ability to secure compliance. See, e.g., Shillitani, 384 U.S. at 371-72, 86 S.Ct. 1531.
 
 
 96
 We turn to whether the length of Armstrong's confinement is determinative of whether there is "no wilful disobedience but only an incapacity to comply." Maggio, 333 U.S. at 74, 68 S.Ct. 401. As the Supreme Court explained in Maggio,
 
 
 97
 [An incarcerated contemnor's] denial of possession is given credit after demonstration that a period in prison does not produce the goods. The fact that he has been under the shadow of the prison gates may be enough, coupled with his denial [that he possesses the goods] and . . . evidence [of present conditions or intervening events, which would corroborate his denial], to convince the court that his [denial] is not a wilful disobedience which will yield to coercion.
 
 
 98
 Id. at 76, 68 S.Ct. 401 (emphasis added).
 
 
 99
 The Court's statement in Maggio can be viewed as an "inference that may be drawn under most circumstances when a contemnor, despite long confinement, fails to comply with an order." Chadwick v. Janecka, 312 F.3d 597, 611 (3d Cir.2002) (Alito, J.). "Thus, in most cases, after a certain period, the inference that the contemnor is unable to comply becomes overwhelming." Id. at 612. Armstrong's case, however, is not the ordinary case. Fifteen million dollars is a life-altering amount of money.[7] We think that the value of the concealed property is a significant factor to the extent that it would lead the contemnor to conclude that the risk of continued incarceration is worth the potential benefit of securing both his freedom and the concealed property. See Armstrong III, 284 F.3d at 406 ("True, Armstrong has been confined for more than two years, but the length of confinement must be viewed in the light of the value of the concealed property, which is unusually great.").[8]
 
 
 100
 Armstrong misunderstands the import of Maggio when he argues that it was intended to establish a rule that, upon the passage of some specific period of coercive imprisonment that fails to induce compliance, an inference must be drawn of an inability to comply. Maggio's point was rather to explain that a previous finding made by a court that the subject of an order had been able to comply, but had contumaciously refused to do so, does not bar reexamination of the question of the subject's ability to comply at a later time, especially when changes in circumstances since the making of the first finding, including time spent in jail without producing compliance, provides strong reason to doubt the contemnor's continued ability to comply.[9]
 
 
 101
 We also reject Armstrong's contention, also advanced by Judge Sotomayor in her concurring opinion, that Congress intended the Recalcitrant Witness Statute to indicate a presumptive benchmark suggesting a limit dictated by the Due Process Clause for all coercive confinements. Section 1826(a) was carefully drafted to apply to one particular category of contemnor: A "witness . . . [who] refuses without just cause shown to comply with an order of the court to testify or provide other information." 28 U.S.C. § 1826(a); see also Gelbard v. United States, 408 U.S. 41, 73, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972) (Rehnquist, J., dissenting) (stating that the statute expresses a "desire on the part of Congress to treat separately from the general contempt power of courts their authority to deal with recalcitrant witnesses in court or grand jury proceedings"); Mitchell, 556 F.2d at 383 (stating that the statute "deals with civil contempt for certain specific acts"). Nothing in § 1826(a) suggests that Congress intended that it apply as a presumptive benchmark, or in any other way, to contemnors who do not fit within that category.
 
 
 102
 Furthermore, we can easily appreciate that the class of contemnors for which Congress established the eighteen-month ceiling can present circumstances that understandably motivated Congress to establish such a ceiling for that particular class. Persons who go to jail rather than obey a court order to testify frequently do so in the service of some useful and socially worthwhile principle. In some cases (which invariably receive widespread publicity and therefore have surely come to the attention of Congress), it is a journalist who believes she would violate the ethical standards of her profession if she revealed a source to whom she promised confidentiality. In other cases, it is a member of some other profession—medical, legal, religious—who similarly believes that the ethical standards of her profession would be compromised by revelation of confidences (under circumstances where the court's finding of waiver of a privilege does not convince the witness that any such waiver was voluntary). In still other cases, the court's order to testify forces the witness to violate a loyalty to a family member or close friend. Even when the relationship between the witness and the subject of the testimony sought is merely that of partners in crime, our social mores are not deeply offended by the criminal who would rather spend time in jail than squeal on his partner. Accordingly, in passing a statute which imposes an eighteen-month limitation on coercive contempt confinement for recalcitrant witnesses but not for other categories of civil contemnors, Congress has not acted arbitrarily or irrationally. Although one could argue that not everyone coming within § 1826(a)'s scope is motivated by such admirable purposes, there appear to be good reasons for Congress to have selected for special treatment that class of contemnors.
 
 
 103
 We also acknowledge that there are situations where a contemnor might not come within the terms of § 1826(a) but whose circumstances nonetheless raise the same types of considerations as those of a recalcitrant witness covered by the statute. Yet Congress need not achieve a perfect fit in enacting legislation. And even if an argument could be made that such a person should benefit from the same ceiling that Congress imposed for the recalcitrant witness, that argument would do nothing for Armstrong. His case does not raise the types of considerations that led Congress to impose a ceiling for the special benefit of recalcitrant witnesses. The district court's order does not require Armstrong to choose between subservience to law and his ethical principles, nor does it require him to violate bonds of personal loyalty to a family member or friend, or even a partner in crime. According to the district court's findings, Armstrong is motivated by greed. He is willing to suffer time in jail in the hope of ending up in possession of $15 million in assets of a corporation to which he owes fiduciary duties. The Due Process Clause does not demand that the test of his obduracy end today or, for that matter, at any specific time.
 
 
 104
 Our ruling on this issue of course depends on the district court's finding that Armstrong is capable of complying but chooses not to do so. We note that two years have passed since the district court last held a hearing to determine whether Armstrong was able to comply with its order. As the Supreme Court emphasized in Maggio, circumstances can change. A contemnor who was found to be capable of complying with an order to turn over assets at a particular date is not necessarily capable of doing so forever. A person previously found to be in contempt for failure to obey an order to produce property in his possession "would always have the right to be released as soon as the fact becomes clear" that he is no longer capable of obeying because he is not in possession of the property or its proceeds. Maggio, 333 U.S. at 72, 68 S.Ct. 401. We believe the district court may not indefinitely rely on its prior finding. After the passage of a significant period of time, a contemnor who is coercively confined and claims, like Armstrong, to be incapable of complying with the court's order, is entitled to have the court convene a new hearing at which the court will reconsider, regardless of past findings, whether the person is presently capable of complying.
 
 
 105
 Accordingly, under our supervisory authority, we direct the district court, after giving reasonable notice to the parties so that they may prepare adequately, to convene as soon as practicable a new hearing into whether Armstrong is in possession of the property (or the proceeds thereof) which is the subject of the court's production order so that he is able to comply with it. Further, while we emphasize that we have never found any fault in Judge Owen's skillful handling of this case, we believe that on the seventh anniversary of Armstrong's confinement, his case deserves a fresh look by a different pair of eyes. We therefore direct the district court to reassign the case randomly to a different district court judge on remand.
 
 III. Bail Application
 
 106
 Armstrong argues that the district court abused its discretion when it denied bail pending the resolution of his habeas petition. We find no abuse of discretion.
 
 
 107
 Armstrong has not overcome the "presumption of correctness" that we must accord a district court's bail determination in a habeas proceeding. Hilton, 481 U.S. at 777, 107 S.Ct. 2113; see also Fed. R.App. P. 23(d). In any event, Armstrong's claim is moot: He sought bail pending the resolution of his petition for a writ of habeas corpus; that controversy ended when the district court denied his petition.
 
 CONCLUSION
 
 108
 For the foregoing reasons, the orders of the district court are AFFIRMED. The case is REMANDED and ordered to be REASSIGNED to another district court judge for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 See also Weinberger v. Romero-Barcelo, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (stating that "`the comprehensiveness of [the courts'] equitable [authority] is not to be denied or limited in the absence of a clear and valid legislative command'" (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946))); Link v. Wabash R.R. Co., 370 U.S. 626, 630-32, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (holding that a federal district court has the inherent power to dismiss a case sua sponte for failure to prosecute, even though the language of Federal Rule of Civil Procedure 41(b) seemed to require a motion of the party, because sua sponte dismissal "has generally been considered an inherent power" and if the Court was "to assume that [Rule 41(b)] was intended to abrogate so well-acknowledged a proposition" it "would require a much clearer expression of purpose than Rule 41(b) provides"); Hecht Co. v. Bowles, 321 U.S. 321, 330, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (concluding that "if Congress desired to make such an abrupt departure from traditional equity practice as is suggested, it would have made its desire plain").
 
 
 [2]
 Although we express no view on this point, we note that an argument can be made that Congress never intended for the Non-Detention Act to apply to a federal court's inherent power to enforce its orders by coercive civil confinementSee, e.g., 117 Cong. Rec. 31,541 (1971) (statement of Rep. Poff) ("It is not the committee's intent to eliminate any detention practices presently authorized by statute or judicial practice and procedure .... Detentions incident to judicial administration such as those authorized by the judicial authority to maintain order in a courtroom, judicial contempt powers, and the judicial authority to revoke bail or parole, are not within the intendment of the committee's amendment."); see also id. at 32,145 (statement of Sen. Inouye) (explaining that the House bill "should be viewed as in no way granting authority to eliminate any detention practices now authorized by statute, judicial practice or procedure, such as ... judicial authorization to revoke bail or parole, or to detain those so as to maintain order in the courtroom"); cf. id. at 31,541 (statement of Rep. Kastenmeier) ("[The amendment] provides that there must be statutory authority for the detention of a citizen by the United States. Existing detention practices are left unaffected. Incarceration for civil and criminal contempt ... are already covered by statutes.").
 
 
 [3]
 The story of Judge James H. Peck's actions, which drew the ire of the general public and led to impeachment proceedings that fell just one vote short of convicting the embattled jurist, has been catalogued by numerous academics and commentatorsSee, e.g., Walter Nelles & Carol Weiss King, Contempt by Publication in the United States, 28 Colum. L.Rev. 401, 423-30 (1928) (describing the events which culminated in Judge Peck's impeachment proceedings); see also Dudley, supra, at 1034 n. 32.
 
 
 [4]
 Section 2 of the Act of 1831 provided a further declaration on the law of contempt, as it related to sanctions for acts of corruption, threats, or force intended to "influence, intimidate, or impede any jury, witness, or officer" of the courts of the United States; it provided that such contempts were subject to prosecution, indictment, and conviction and could "be punished, by a fine not exceeding five hundred dollars, or by imprisonment, not exceeding three months, or both." Act of March 2, 1831, ch. 99, § 2, 4 Stat. 487, 488. During the codification process, sections 1 and 2 of the Act were placed in separate sections of the Revised StatutesSee Rev. Stat. §§ 725, 5399 (1875); see also Savin, 131 U.S. at 274-75, 9 S.Ct. 699 (setting forth the relevant session-law provisions and their code-section corollaries); Nelles & King, supra, at 431 n.157. Also during the codification process, "the language [in section 1 of the Act of 1831] was changed to eliminate the reference to `attachments' and `summary punishments,' see Rev. Stat. § 725 (2d ed. 1878), though there is no evidence whether this was intended as a substantive change." Dudley, supra, at 1034 n. 32; see also Savin, 131 U.S. at 274-75, 9 S.Ct. 699. Section 1 was subsequently re-codified and placed in the Judicial Code, 28 U.S.C. § 385 (1926), whereas section 2 was placed in the Criminal Code, 18 U.S.C. § 241 (1926).
 
 
 [5]
 By 1940, three federal appellate courts, including this court, had held that section 268 of the Judicial Code of 1911 not only applied to remedial civil contempt (and, by implication, permitted a court to "punish [such contempts] by fine or imprisonment"), but also restricted the exercise of that authority to the three categories of contempt provided in that sectionSee Raymor Ballroom Co. v. Buck, 110 F.2d 207, 210-12 (1st Cir.1940) (holding that resisting a writ of execution was contempt within the meaning of section 268 of the Judicial Code and affirming the order of the district court, which directed the contemnors to pay a remedial fine to the plaintiffs); In re Sixth & Wisconsin Tower, Inc., 108 F.2d 538, 539-41 (7th Cir.1939) (holding that section 268 applied to a remedial order directing one party to pay a fine to another, but reversing the contempt order because the purportedly contemptuous act did not fall within any of the three categories of contempt set forth in the statute); Berry v. Midtown Serv. Corp., 104 F.2d 107, 108-11 (2d Cir.1939) (affirming an order of the district court denying a motion to show cause why the defendant should not be fined for civil contempt because the defendant's actions did not fall within any one of the three categories set forth in section 268); cf. Sixth & Wisconsin Tower, 108 F.2d at 542-46 (Evans, J., concurring in part) (arguing that Congress could not limit the district court's inherent power to order remedial civil contempt and, as a result, construing the statute to reach only criminal contempt, but concurring in the judgment of the court because the district court failed to provide an adequate contempt hearing).
 
 
 [6]
 The defendants, who were eventually convicted and sentenced to substantial prison terms, were given credits to their sentences for time spent in civil confinement beyond eighteen monthsSee Mitchell, 556 F.2d at 385.
 
 
 [7]
 In his briefing, Armstrong argues that the district court "inflated" the value of the missing assets "by disregarding competent evidence" in the form of Nigel Kirwan's declaration. We disagree. Kirwan didnot state that he took possession of $10 million in missing assets; he simply stated that Armstrong had agreed to provide him with $10 million in exchange for future profits from a joint business venture. If anyone is guilty of inflating, it is Armstrong who has inflated the value of Kirwan's declaration. Moreover, Armstrong did not proffer Kirwan as a witness at the hearing, and therefore did not present his adversaries with an opportunity to cross-examine him. The district court was justified in disregarding the affidavit.
 
 
 [8]
 We recognize that the keys-to-his-prison rationale has its criticsSee, e.g., Dudley, supra, at 1063. The principal objection is that if the contemnor lacks the ability to comply, and if he fails to convince the court of this fact, he could be incarcerated indefinitely. Such a concern need not trouble us, however, because Armstrong has never made a serious effort to demonstrate that compliance is impossible.
 
 
 [9]
 We believe that Judge Sotomayor advances a similarly mistaken argument in her concurring opinion by arguing that there is no practical difference between one who is "incapable of complying" and one who "simply chooses not to do so." According to Judge Sotomayor, in either case, "there is a limit to how long [that person] can be incarcerated." We disagree. In the first place, there is no justification for incarcerating a person who is "incapable of complying" even for one day. Furthermore, the point ofMaggio and Chadwick is precisely that there is a crucial difference between one who is capable of complying and refuses to do so and one who is not capable of complying. In light of this precedent, we decline to adopt a rule eliminating that distinction, as it would provide a contemnor who is capable of complying with a powerful incentive to resist a court's lawful order based on the hope that simple resistance will result in her freedom. These two classes of contemnors are fundamentally different and should not be treated similarly in "divining the line between coercive and punitive sanctions."
 
 
 
 109
 SOTOMAYOR, Circuit Judge, concurring.
 
 
 110
 I agree with Judge Walker's opinion in affirming the district court's contempt sanction, but I write separately to articulate my belief that the eighteen-month maximum duration imposed on a civil contempt sanction by the Recalcitrant Witness Statute should be a presumptive benchmark for all civil contempt incarcerations. A sanction lasting more than four times the congressional benchmark for such punishments is so extreme that, as Judge Walker rightly directs, the district court should undertake soon to revisit whether Armstrong's imprisonment has slipped into the impermissible terrain of a punitive sanction.
 
 
 111
 The Supreme Court has made clear that "[d]ue process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." Jackson v. Indiana, 406 U.S. 715, 738, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972). In the context of civil contempt, the Supreme Court has also made clear that, at some point, an imprisoned contemnor must be released: "It is everywhere admitted that even if he is committed, he will not be held in jail forever if he does not comply. His denial of possession is given credit after demonstration that a period in prison does not produce the goods." Maggio v. Zeitz, 333 U.S. 56, 76, 68 S.Ct. 401, 92 L.Ed. 476 (1948). Yet while "the due process test is easily formulated, the point at which coercive imprisonment actually ceases to be coercive and essentially becomes punitive is not readily discernible." In re Grand Jury Investigation (Joseph Braun), 600 F.2d 420, 425 (3d Cir.1979) ("Braun").
 
 
 112
 This Court has joined the Third Circuit in holding that the Recalcitrant Witness statute's eighteen-month limit on incarceration for civil contempt represents Congress's carefully-considered attempt to find the line between coercive and punitive detention. See Simkin v. United States, 715 F.2d 34, 37 (2d Cir.1983). In Braun, the Third Circuit wrote,
 
 
 113
 Congress has, in effect, addressed essentially the same problem that courts must tackle under a due process analysis, and has thereby filled the void that existed under prior practice, where there was a possibility that unconscionable, indeterminate periods of confinement might be imposed for civil contempt. It has not been suggested that Congress's resolution of the problem is unreasonable, and it would therefore appear to be inappropriate for the judiciary to substitute its judgment for that of the legislative body by undertaking as a routine matter to draw finer lines than Congress has already drawn between coercive and punitive periods of confinement.
 
 
 114
 Id. at 427. We endorsed this view in Simkin, and credited the eighteen-month time limit as an effort in congressional line-drawing and a presumptive outer bound for civil contempt sanctions. We held "that in the absence of unusual circumstances," it would be inappropriate for a reviewing court "to conclude, as a matter of due process, that a civil contempt sanction has lost its coercive impact at some point prior to the eighteen-month period prescribed as a maximum by Congress." Id. This due process presumption should work in the opposite direction, as well: Except in unusual circumstances, a civil contempt sanction longer than eighteen months should be presumed to be punitive.
 
 
 115
 My discussion of Simkin and Braun is by no means meant to suggest that the Recalcitrant Witness Statute's eighteen-month limit is a statutory maximum binding on the district court's exercise of its inherent contempt power. As noted above, I believe that the Recalcitrant Witness Statute's eighteen-month limit represents Congress's best effort to articulate a benchmark where one is "not readily discernible." Braun, 600 F.2d at 425. I see nothing in the legislative history or the case law suggesting that Congress's determination of what length of incarceration for contempt comports with due process is limited to § 1826 or to the specific class of contemptuous conduct it covers. This presumptive benchmark places no constraint on the inherent contempt powers of the court, but it should not lightly be ignored.
 
 
 116
 Two years ago, we found that the district court did not abuse its discretion by finding that Armstrong's continued incarceration serves a coercive purpose. See SEC v. Armstrong, 88 Fed.Appx. 460 (2d Cir.2004) (unpublished opinion). But two years have passed, and Armstrong has since pled guilty to conspiracy to commit securities fraud; as Judge Walker has directed, the district court ought now, once again, to hold an evidentiary hearing to ensure that Armstrong's incarceration remains coercive, not punitive, and that it holds the potential eventually to compel his compliance with the court order. Where, as here, the incarceration is nearly four times the length of the congressional benchmark, the showing of unusual circumstances should become more demanding.
 
 
 117
 Judge Walker's opinion relies on Maggio v. Zeitz, 333 U.S. 56, 76, 68 S.Ct. 401, 92 L.Ed. 476 (1948), to support its holding that Armstrong's incarceration does not violate due process, and draws guidance in its interpretation of Maggio from Chadwick v. Janecka, 312 F.3d 597 (3d Cir. 2002), in which then-Judge Alito interpreted the Supreme Court's statement in Maggio as articulating "an inference that may be drawn under most circumstances when a contemnor, despite long confinement, fails to comply with an order." Id. at 611. In most cases, Judge Alito continued, "after a certain period, the inference that the contemnor is unable to comply becomes overwhelming." Id. Judge Walker's opinion holds that Armstrong's case falls outside the scope of Maggio because here, "the value of the concealed property is relevant to the extent that it would lead the contemnor to conclude that the risk of continued incarceration is worth the potential benefit of securing both his freedom and the concealed property." Supra 111. While we afford the district court "virtually unreviewable discretion both as to the procedure [it] will use to reach [its] conclusion, and as to the merits of [its] conclusion," Simkin, 715 F.2d at 38, in its imposition of contempt sanctions, we still require that the district court adequately assess the possibility that Armstrong's detention does not, and will not, have a coercive purpose, and is now simply punishment for his refusal to cooperate. The value of the concealed property is only one factor among many that ought to be considered in determining whether unusual circumstances exist to justify a detention lasting longer than eighteen months.
 
 
 118
 It bears noting that Chadwick applies only to those situations in which the length of a contemnor's incarceration gives rise to an inference that he or she is incapable of complying with the court's order. This case presents a different scenario: Here, Armstrong has given us no reason to believe that he is not in possession of the property, other than his own testimony which the district court did not believe. He may not be incapable of complying with the court's order, or rather, he simply chooses not to do so, most likely out of sheer greed. Whether the contemnor's failure to comply with the court's order is attributable to inability or resolute unwillingness, there is a limit to how long he or she can be incarcerated when such a sanction has no coercive power. Armstrong's refusal to comply shares with a journalist's refusal to name her source an unwillingness that, at some point, becomes so steadfast that incarceration cannot be regarded as exerting any coercive effect. At that point, the sanction becomes punitive, and the government or the district court must resort to other measures to secure their desired result.
 
 
 119
 I do not dispute the assertion made in Judge Walker's opinion that the Recalcitrant Witness Statute and its eighteen-month cap on incarceration for contempt were likely meant to cover a particular category of contemnors whose willingness to go to jail rather than comply with a court order is "in the service of some useful and socially worthwhile principle." Supra 112. But for the purposes of divining the line between coercive and punitive sanctions, I believe that inability to perform and resolute unwillingness to perform must, at some point, be treated similarly. Armstrong has rightfully been sanctioned for his obduracy. But his compliance is seemingly not forthcoming. After nearly seven years, a question arises as to whether any amount of jail time will compel him to produce the goods he undoubtedly possesses. At some point, the district court must turn to the other tools at its disposal both for securing the return of the property allegedly in Armstrong's possession and for punishing him for stealing and keeping it. For example, the government is, of course, free to initiate a criminal contempt proceeding against Armstrong, and if he is convicted, the court is free to impose a lengthy sentence of definite duration. The court could also include a restitution order in Armstrong's sentence, which could result in further punishment if Armstrong refuses to comply with it.
 
 
 120
 Judge Walker's opinion suggests that there is no discernible outer bound on a court's inherent power to detain a contemnor indefinitely. Indeed, the question of whether such indefinite detention is within a court's inherent power is not before this Court, and I write to underscore my belief that Judge Walker's opinion should not be construed to license such indefinite detention. The district court's finding that Armstrong is motivated solely by greed is not enough to justify disregard for due process. Courts must exercise caution in their use of the contempt power and must recognize when it has reached the limits of its utility. The Fifth Amendment provides the final constraint on incarceration for civil contempt, and I encourage the district court to be vigilant in policing the boundary-line between the coercive and the punitive.