06-1010-ag
Fong Chen v. Gonzales

# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

————

August Term, 2006

(Argued: February 13, 2007                    Decided: June 14, 2007)

Docket No. 06-1010-ag

————

FONG CHEN,

*Petitioner*,

– v. –

ALBERTO R. GONZALES, Attorney General and BOARD OF IMMIGRATION APPEALS,

*Respondent*s.

————

Before: WALKER and CALABRESI, *Circuit Judges*, and COTE, *District Judge*.[*]

    Petitioner, a native and citizen of the People's Republic of China, petitions for review of an order of the Board of Immigration Appeals denying petitioner's untimely motion to reopen removal proceedings. The petition is GRANTED.

> HENRY ZHANG, Zhang and Associates, P.C., New York, NY, *for Petitioner*.

———

[*] The Honorable Denise Cote, of the United States District Court for the Southern District of New York, sitting by designation.

Paul Naman, Assistant United States Attorney, *for* Matthew D. Orwig, United States Attorney for the Eastern District of Texas, Beaumont, TX (on submission), *for Respondents*.

PER CURIAM:

In *Shou Yung Guo v. Gonzales*, 463 F.3d 109 (2d Cir. 2006), this court discussed three documents that "apparently reflect[] the adoption of a new policy in Changle City," in the Fujian Province of the People's Republic of China. *Id.* at 114. Two of the documents, allegedly 2003 decisions from the Changle City Family-Planning Board and Fujian Province Department of Family-Planning Administration ("2003 decisions"), stated, in effect, that foreign-born children will be counted in determining violations of the one-child policy, and that Chinese nationals who have children abroad will be treated the same as those who have children in China.[1] The third document, dated 1999 and entitled "Q & A for Changle City Family-Planning Information Handbook" ("Q & A Handbook"), indicated that, at least in Changle City, the birth of a second child would result in forced sterilization.

In *Shou Yung Guo*, we remanded, so that the BIA could determine the veracity of the documents, and if they were valid, consider their effect on Guo's petition. *Id.*

The present case, which involves two of the three documents discussed in *Shou Yung*

---

[1] *See id.* at 113 ("'[W]here either parent remains a Chinese national and citizen with no permanent residence overseas, any child of such a couple . . . is deemed a Chinese national and shall not be treated as [a] foreign national or citizen for domestic administrative purposes.'" (quoting alleged 2003 decision of Changle City Family-Planning Administration)); *id.* ("'[N]o exception or waiver shall be applicable to Chinese nationals and citizens who engage in reproductive behavior overseas in violation of family-planning regulations as enforced in his or her area of residence of household registration in China. . . . Such Chinese nationals and citizens shall be subject to family-planning enforcement upon resettlement in China.'" (quoting alleged 2003 decision of Fujian Province Department of Family-Planning Administration)).

*Guo*, raises the following questions, in addition to the veracity of the documents: (1) whether a petitioner who submits only the 2003 decisions, but not the Q & A Handbook, has presented sufficient evidence of the alleged policy discussed in *Shou Yung Guo*; (2) whether the alleged policy discussed in *Shou Yung Guo* might constitute evidence of "changed country conditions," even if they only provide previously unavailable evidence of a pre-existing policy; and (3) whether a petitioner whose children were born in the United States *after* he had been ordered to depart may rely on that potential evidence of changed conditions.

We answer the first question in the affirmative, and decline to rule on the second and third at this stage in the proceedings. The petition for review is granted, and the case is remanded to the BIA for further proceedings.

**BACKGROUND**

Petitioner Fong Chen, a native and citizen of the People's Republic of China, asked the BIA to reopen its June 29, 1995 order, which had affirmed the January 31, 1995 decision of Immigration Judge ("IJ") Patricia A. Rohan denying the petitioner's application for asylum and withholding of removal. *In re Fong Chen*, A 72 483 714 (B.I.A. June 29, 1995), *aff'g* No. A 72 486 714 (Immig. Ct. N.Y. City Jan. 31, 1995). The BIA denied Chen's motion as untimely. *In re Fong Chen*, No. A 72 483 714 (B.I.A. Feb. 27, 2006).

Chen is from Changle City, in the Fujian Province of China. His motion to reopen — which he filed over ten years after the BIA's and IJ's denial of his application for asylum and withholding of removal — stated that "he is now married, is the parent of two United States citizen sons, and fears that he will suffer persecution in his country for violating China's population control law.". Specifically, on June 5, 2002, several years after he was ordered to depart but while he was still in the United States, Chen was married. He then had two children,

one on December 26, 2003, and the other on August 25, 2005.

In order for his untimely motion to reopen to be considered, *see* 8 C.F.R. § 1003.2(c)(2), Chen was required to show, through evidence that was not available or obtainable at the previous hearing, a change in *country* circumstances arising in China, *see* 8 C.F.R. § 1003.2(c)(3)(ii). The BIA, in denying Chen's motion, found that Chen had failed to make such a showing, because (1) his alleged changed *personal* conditions did not meet the requirements for an untimely motion to reopen filed under 8 C.F.R. § 1003.2(c)(3)(ii); and (2) while Chen had submitted, in support of his motion, corroborative documents — including the 2003 decisions — and affidavits of three female relatives who claimed to have been sterilized in China for having violated the family planning policies, this evidence would, at most, only establish "the 'continued' implementation of policies rather than a material change in policies."

## DISCUSSION

Chen now petitions this court for review of the BIA's order denying his untimely motion to reopen. We review such a denial for abuse of discretion. *Twum v. INS*, 411 F.3d 54, 58 (2d Cir. 2005). Despite the agency's discretion, we have made clear, however, that "IJs and the BIA have a duty to explicitly consider any country conditions evidence submitted by an applicant that materially bears on his claim" and that "a similar, if not greater, duty arises in the context of motions to reopen based on changed country conditions." *Shou Yung Guo*, 463 F.3d at 115 (citations and internal quotation marks omitted).

Following the BIA's denial of Chen's untimely motion to reopen, this court, in *Shou Yung Guo*, 463 F.3d at 114-15, recognized the existence of documents that, if genuine, may constitute evidence of "a *new* policy in Changle City" of forcible sterilization. *Id.* at 114 (emphasis added). Since then, the government has consented to remand a series of cases in

which the *Shou Yung Guo* documents might be relevant. *See Tian Ming Lin v. U.S. Dep't of Justice*, 473 F.3d 48, 51 (2d Cir. 2007). But the government has not consented to a remand here, and, accordingly, we must determine for ourselves whether to grant Chen's petition for review.

**I**

In his untimely motion to reopen, Chen submitted copies of the 2003 decisions. But he did not also submit a copy of the Q & A Handbook. Nonetheless, we conclude that Chen's case is controlled by our holding in *Shou Yung Guo*.

While the 2003 decisions do not appear to announce that the penalty in Change City is in fact *sterilization* — as only the Q & A Handbook does — those 2003 decisions do "reflect[] the adoption of a *new policy* in Changle City," namely, that "foreign-born children would be counted in determining violations of the one-child policy." *Shou Yung Guo*, 463 F.3d at 114 (emphasis added). The fact that Chen did not also submit the Q & A Handbook means that his claim may be weaker than the claim of the petitioner in *Shou Yung Guo* — since, in Chen's case, the link must still be made between counting "foreign-born children . . . in determining violations of the one-child policy" and forced sterilization — but that omission does not necessarily undermine Chen's claim. That is because the fact that violations have led in some instances to sterilization has long been taken at least to be arguably so, and Chen submitted affidavits from three female relatives in China essentially to that effect.

Accordingly, we hold that the 2003 documents, even without the Q & A Handbook, are sufficient to present to the BIA the same alleged policy discussed in *Shou Yung Guo*.

**II**

Petitioner's position is that the *Shou Yung Guo* documents are real — a question that is currently before the BIA in the cases in which the government has consented to a remand.

-5-

Petitioner, however, because he sought reopening over ten years after his initial asylum application was denied, must also show that there has been a change in country conditions. That is, Chen must show that the *Shou Yung Guo* documents are not only real, but also constitute evidence of a *new* policy in Changle City. And the BIA, in denying Chen's untimely motion to reopen, concluded simply that "[a]lthough [Chen] alleges that conditions in China have changed, [he] point [sic] to the 'continued' implementation of policies rather than a material change in policies."

The basis for the BIA's holding is unclear from this language. On the one hand, in concluding that Chen "failed to show materially changed conditions in China," the BIA cited, among other cases, *Jian Xing Huang v. INS*, 421 F.3d 125, 128 (2d Cir. 2005), which suggests the BIA meant that the evidence provided by Chen, including the *Shou Yung Guo* documents, did not demonstrate the existence of an official policy of forced sterilization for those Chinese couples having children abroad and that such evidence did not, therefore, show a change in country conditions. That is, it seems the BIA concluded that the evidence presented did not demonstrate a change from a policy of opposing forced sterilization to one of requiring it in Chen's circumstances. This understanding of the BIA's holding is supported by the BIA's continued, even recent, reliance on State Department reports which claim that the Chinese government opposes forced sterilization. *See, e.g.*, *In re C-C-*, 23 I. & N. Dec. 899, 903 (B.I.A. 2006) (finding the State Department reports more persuasive than the Aird Affidavit in determining the changes that an alien will be sterilized if returned to China).

Accordingly, it may be that the BIA simply concluded that the evidence, including the *Shou Yung Guo* documents, did not establish a change from a policy of opposing forced sterilization to one of requiring it in Chen's circumstances.

On the other hand, the BIA's holding could be construed as not being critical of Chen's argument that there is a policy of forced sterilization in China, but that to the extent there is such a policy, it has been in effect since the BIA dismissed his appeal in 1995; and, as such, Chen failed to show that conditions in China have changed. But even if the policy reflected in the *Shou Yung Guo* documents is a longstanding one, it might, nonetheless, be possible that the finding of these documents (assuming, yet again, that they are real) constitutes the equivalent of changed country conditions, notwithstanding the date of their issuance. This is so because they might vary the perception of the State Department, upon which the immigration courts rely, which would warrant reopening under 8 C.F.R. § 1003.2(c).[2] In *Norani v. Gonzales*, for instance, we noted that recent reports, both by the State Department and the press, "describe[d] a sharply deteriorating human rights situation" in Iran, 451 F.3d 292, 294 (2d Cir. 2006) (per curiam), without pausing to parse whether it was our *perception* of the situation in Iran or the *situation itself* that had changed.

Indeed, this court and the BIA routinely rely on the State Department and the press in assessing the situation in foreign countries. It would make little sense to distinguish between the "actual" changed situation and the situation as we have come to perceive it to be, on the basis of sometimes long delayed information that has only recently percolated up from our sources.

But we need not determine whether the *Shou Yung Guo* documents may establish "changed country conditions" even if they reflect a longstanding policy. In accordance with *Gonzales v. Thomas*, 126 S. Ct. 1613, 1615 (2006), we remand to the BIA for additional explanation and investigation into that question. The BIA may answer it in the negative. But, if

---

[2] It might also warrant reopening under § 1003.2(a) (permitting the BIA *sua sponte* to reopen or reconsider "at any time").

-7-

such is the BIA's finding, it must make its reasons plain so as to afford meaningful appellate review. *See Poradisova v. Gonzales*, 420 F.3d 70, 77 (2d Cir. 2005).

**III**

Even if the documents are determined to be valid, and even if they are held to establish changed country conditions in the above sense, there arises the question of whether petitioner's motion to reopen could have been denied on the ground that his children were born *after* he had been ordered to depart. The panel in *Shou Yung Guo* appears to have left this question open. *See Shou Yung Guo*, 463 F.3d at 115 ("[Petitioner] had given birth to a child in China prior to filing her application for asylum in 1993, and gave birth to a second child in 1995 after arriving in the United States, *but before being ordered to depart in 1996*. Therefore, [petitioner] appears to fall in the category of persons described in the documents." (emphasis added)).

The government argues to us that our holding in *Wang v. BIA*, 437 F.3d 270 (2d Cir. 2006), requires the BIA's denial of Chen's untimely motion to reopen in this case. *See id.* at 274 ("[W]here a petitioner is seeking to reopen his asylum case due to circumstances entirely of his own making after being ordered to leave the United States. . . . it would be ironic, indeed, if petitioners like Wang, who have remained in the United States illegally following an order of deportation, were permitted to have a second and third bite at the apple simply because they managed to marry and have children while evading authorities. This apparent gaming of the system in an effort to avoid deportation is not tolerated by the existing regulatory scheme."). But the panel in *Wang* held solely that "[a] self-induced change in personal circumstances cannot suffice." *Id.* at 274 (emphasis added). Because the *Wang* panel rejected the petitioner's evidence of changed country conditions, all that was left in that case were changed personal conditions. The *Wang* panel, therefore, had no occasion to consider the distinct issue raised here, namely,

whether a petitioner whose changed *personal* conditions (which result in his falling into a category of individuals threatened by changed *country* conditions) can rely on those changed country conditions in an untimely motion to reopen where the underlying change in personal conditions postdated his order to depart.

This question appears to be an open one. And because the agency has yet to address it, we decline to consider it now. *See INS v. Orlando Ventura*, 537 U.S. 12 (2002) (per curiam) ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that statutes place primarily in agency hands."); *see also Ucelo-Gomez v. Gonzales*, 464 F.3d 163, 168-70 (2d Cir. 2006). We therefore remand to the BIA (1) the question of the veracity of the 2003 documents; (2) the question of whether the 2003 decisions, if valid, establish a changed understanding of country conditions; and finally, (3) the question of whether Chen's changed conditions support reopening, given the fact that they derive from changed personal conditions that occurred after Chen's departure was ordered.

**CONCLUSION**

The petition for review is GRANTED, and the case is REMANDED to the BIA for further proceedings.