04-0042-ag
Ni v. Gonzales

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: February 14, 2007          Decided: July 12, 2007)

Docket No. 04-0042-ag

- - - - - - - - - - - - - - - - - - - -x

XIAO XING NI,

                    Petitioner,

          -v.-

ALBERTO GONZALES, Attorney General,[*]

                    Respondent.

- - - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, Chief Judge, WALKER, CALABRESI, Circuit Judges.

Petition for review of a final decision and order of removal of the Board of Immigration Appeals summarily affirming an immigration judge's denial of an application for asylum, withholding of removal, and relief under the Convention Against Torture.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto Gonzales is substituted for his predecessor, Attorney General John Ashcroft, as respondent.

Petition denied.

Judge Calabresi concurs in a separate opinion.

JOAN XIE, New York, NY, for Petitioner.

KELLY A. ZUSMAN, Assistant United States Attorney (Kenneth C. Bauman, on the brief), for Karin J. Immergut, United States Attorney, District of Oregon, Portland, OR, for Appellee.

DENNIS JACOBS, Chief Judge:

Xiao Xing Ni, a native and citizen of China, seeks review of a December 15, 2003 order of the Board of Immigration Appeals ("BIA") affirming the July 18, 2002 decision of an immigration judge ("IJ").  In re Xiao Xing Ni, No. A79 399 277 (B.I.A. Dec. 15, 2003), aff'g A79 399 277 (Immig. Ct. N.Y. City July 18, 2002).  The IJ determined that Ni's testimony was not credible, and denied her application for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").

For the reasons that follow, we conclude that the IJ's decision was supported by substantial evidence.  More analysis is required, however, because: [i] Ni has given birth to one child; [ii] certain documents (mentioned in Jin Xiu Chen v. U.S. Department of Justice, 468 F.3d 109 (2d

Cir. 2006)) might--if they are authentic--indicate that the birth of one child could result in forced sterilization for a person who is returned to Fujian Province; and [iii] our opinion in Tian Ming Lin v. U.S. Department of Justice, 473 F.3d 48, 52 (2d Cir. 2007) (per curiam), suggests in dicta that, although by statute we "may not order the taking of additional evidence," 8 U.S.C. § 1252(a)(1), we may have "inherent power" to do so in the circumstances presented here. We need not decide whether (despite Congress's proscription) there may be circumstances in which we retain an inherent power to remand to the BIA for the consideration of additional evidence; we hold more narrowly that regardless of whether such residual inherent power exists, we should not exercise it if: [i] the basis for the remand is an instruction to consider documentary evidence that was not in the record before the BIA; and [ii] the agency regulations set forth procedures to reopen a case before the BIA for the taking of additional evidence.

**I**

Ni arrived in the United States in April 2001 and applied for asylum, withholding of removal, and CAT relief

based on her claim of persecution under China's family-planning policy. Her asylum application claimed: She began living with a man in 1996, became pregnant about two years later, was forced to undergo an abortion when the cadre discovered the pregnancy in November 1998, and was fined for a violation of "birth control policy."

At the July 18, 2002 hearing, Ni testified that she and her boyfriend began living together in her parents' house in 1997 when they were both fifteen years old, that they were unmarried because they were under-age, that they had no traditional wedding ceremony because they "were worried about what the neighbors would say," but that neighborhood opinion did not inhibit them from having wedding photographs taken, or from cohabiting unmarried at age fifteen.

Ni further testified that she was given an abortion certificate, that her mother paid a fine imposed on Ni for becoming pregnant outside marriage (and was given a receipt), and that Ni left China when she became pregnant again because she feared another forced abortion and forced sterilization. When asked to explain why the asylum application mentioned no fear of sterilization, Ni twice said that she simply forgot to mention it.

4

Ni's son was born in the United States on November 12, 2001.  The IJ did not make an adverse credibility finding as to Ni's assertion that she has one child, and the government does not dispute the point.

**II**

The IJ found that Ni's testimony was not credible and rejected her application for relief.  The BIA affirmed.  Where, as here, the BIA's decision affirms the IJ's adverse credibility finding without rejecting any portion of the IJ's decision, but emphasizing particular aspects of the reasoning, we review both decisions.  See Guan v. Gonzales, 432 F.3d 391, 394 (2d Cir. 2005) (per curiam).  We review the agency's findings, including credibility findings, for "substantial evidence," Ye v. Dep't of Homeland Security, 446 F.3d 289, 294 (2d Cir. 2006), treating the agency's findings as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary."  8 U.S.C. § 1252(b)(4)(B).

"When a factual challenge pertains to a credibility finding . . . we afford particular deference in applying the substantial evidence standard, mindful that the law must

5

entrust some official with responsibility to hear an applicant's . . . claim, and the IJ has the unique advantage among all officials involved in the process of having heard directly from the applicant." Zhou Yun Zhang v. I.N.S., 386 F.3d 66, 73 (2d Cir. 2004) (internal citations and quotation marks omitted). Our review of an adverse credibility determination is "exceedingly narrow," Melgar de Torres v. Reno, 191 F.3d 307, 313 (2d Cir. 1999), and ensures only that it is "based upon neither a misstatement of the facts in the record nor bald speculation or caprice." Zhang, 386 F.3d at 74.

The adverse credibility finding here was supported by substantial evidence. The IJ found that Ni's credibility was undermined by [i] the implausibility and inconsistency of Ni's testimony about her deference to the neighbors' views regarding her boyfriend and her pregnancy; [ii] Ni's failure to mention her claimed fear of sterilization on direct examination or in her asylum application, or until "the very last part of the hearing when the Court started to ask questions"; and [iii] the discrepancy between Ni's claim that she received an abortion certificate following her forced abortion and the 1998 State Department Country Report

6

which states that United States authorities "are unaware of any so-called 'abortion certificates'" and that "the only document that might resemble such a certificate . . . is a document issued by hospitals upon a patient's request after a voluntary abortion."  Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, China: Profile of Asylum Claims and Country Conditions 24 (Apr. 14, 1998); see also Tu Lin v. Gonzales, 446 F.3d 395, 400 (2d Cir. 2006).

The adverse credibility finding undermines the only record evidence of Ni's alleged past persecution or risk of future persecution.  Accordingly, the BIA's denial of Ni's application for asylum and withholding of removal is supported by substantial evidence.  See Paul v. Gonzales, 444 F.3d 148, 156 (2d Cir. 2006).  Ni has pressed no meaningful challenge to the denial of her CAT claim; so any challenge is waived.  Cf. Yueqing Zhang v. Gonzales, 426 F.3d 540, 546 n.7 (2d Cir. 2005).

**III**

In virtually all cases, the conclusion that substantial evidence supports the IJ's decision would end our inquiry; our review of an IJ's findings is limited to determining

whether "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. 1252(b)(4). Absent a determination that a reasonable adjudicator would be so compelled, or that the IJ committed an error of law, the petition must be denied. See id. However, in Tian Ming Lin v. U.S. Department of Justice, 473 F.3d 48 (2d Cir. 2007) (per curiam), a panel of this Court raised in dicta the prospect that we may be able nevertheless to remand for further fact-finding. The Tian Ming Lin panel: [i] took judicial notice of certain documents that were in the record of another case, Shou Yung Guo v. Gonzales, 463 F.3d 109 (2d Cir. 2006); [ii] relied on Guo for the proposition that the documents, "if authentic," "'apparently reflect[] governmental policy in the province in China where [the petitioner] lived,'" Tian Ming Lin, 473 F.3d at 51-52 (quoting Guo, 463 F.3d at 115); and [iii] remanded to the BIA for consideration of the so-called Guo documents because they "may constitute evidence of an official policy of forcible sterilization in Fujian Province," Tian Ming Lin, 473 F.3d at 51.

The Guo documents (if authentic) concern the possible sterilization of persons who have had two or more children.

_Id._  Ni has had only one; but suspect documents to similar effect regarding persons who have had any number of unauthorized births were in the record in another recent case of this Court: _Jin Xiu Chen v. U.S. Department of Justice_, 468 F.3d 109 (2d Cir. 2006).  Thus, the question before us is whether, if we take judicial notice of the so-called _Chen_ documents, we have inherent power to order a remand for the BIA to consider documents that are not in the record of this case.  To answer this question, the interplay of these recent cases and the underlying statutory framework requires some explication.

In _Shou Yung Guo_, the petitioner moved to reopen her case before the BIA and attempted to establish her risk of torture in China by submitting, _inter alia_, documents that purported to show that in Fujian Province her American-born second child would be counted for purposes of Chinese family-planning policies, and that in Fujian "the birth of a second child would result in forced sterilization."  463 F.3d at 112-13.  The panel observed that although the documents were "unquestionably" material, it was "not apparent to us that the BIA ever really paid any attention to the documents."  _Id._ at 115.  Accordingly, the _Guo_ panel

9

remanded so that the BIA could consider the evidence that had been "casually" and inexplicably "dismissed."[1]  Id.

---

[1] The BIA recently considered the Guo documents in In re J-W-S-, 24 I. & N. Dec. 185 (B.I.A. 2007), and In re J-H-S-, 24 I. & N. Dec. 196 (B.I.A. 2007), and in both cases concluded that "there [was] insufficient evidence to indicate that the applicant ha[d] an objectively reasonable well-founded fear of sterilization on account of his opposition to China's one-child policy if he is removed to China."  In re J-W-S-, 24 I. & N. Dec. at 194; see also In re J-H-S-, 24 I. & N. Dec. at 202 ("Based on the record as a whole, we find that the respondent has not presented sufficient evidence to prove a well-founded fear of future persecution in Fujian Province on account of having fathered two daughters there.").  As discussed above, the Guo documents are not at issue here; the fact scenario here differs from the fact scenarios in J-W-S- and J-H-S-; and the phenomenon that documents of record in some cases are not of record in others is ever-present.

In Chen, we ruled that documents in the record of that case "cast doubt on the IJ's finding that Chen will not face forced sterilization if returned to China."  468 F.3d at 112.  Ni's case is similar, but because the documents are not in this record, we have cause to decide whether we possess inherent power to order the agency to consider them. There may be a question as to whether (or to what extent) J-W-S- and J-H-S- affect determinations to remand for the consideration of record evidence of China's family-planning policies; but we have no occasion to reach that question, let alone answer it.  If it were proper to exercise an inherent power to order the taking of additional evidence, then we would have to consider whether, in Ni's case, such an order would be appropriate under our immigration jurisprudence and as a matter of discretion.  That latter inquiry might raise a question as to how J-W-S- and J-H-S- bear upon the circumstances that supported the remand in Chen.  But since we hold (for reasons that follow in the text) that we should not exercise any inherent power, we have no occasion to decide how J-W-S- and J-H-S- would bear upon the hypothetical exercise of such a power.

10

In Tian Ming Lin, the petitioner alleged similar factual circumstances: he was "the father of two United States-born children" and claimed that he too "would face forced sterilization if returned to Fujian Province." 473 F.3d at 49. Unlike petitioner Guo, however, Lin did not submit the Guo documents to the BIA in support of his motion to reopen. Instead, after the BIA had denied Lin's motion, Lin moved in this Court to remand to the BIA so that the BIA could be given the opportunity to consider the Guo documents. Id. at 51. At a late stage of the appeal, the government joined Lin's request. Id. at 54.

Prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009, we had the authority to remand to the BIA for the taking of additional evidence; that authority was found in 28 U.S.C. § 2347(c), which provides that we "may order . . . additional evidence . . . to be taken by the agency" if the petitioner shows that "the additional evidence is material" and "there were reasonable grounds for failure to adduce the evidence before the agency." See also Tian Ming Lin, 473 F.3d at 52. On remand, the BIA could then "modify its findings of fact, or

11

make new findings, by reason of the additional evidence so taken, and may modify or set aside its order." 28 U.S.C. § 2347(c).

But IIRIRA explicitly revoked our authority to remand to the BIA for the taking of additional evidence pursuant to § 2347(c): "Judicial review of a final order of removal . . . is governed only by chapter 158 of Title 28, . . . except that the court may not order the taking of additional evidence under section 2347(c) of Title 28." 8 U.S.C. § 1252(a)(1). Accordingly, there remained "no statutory mechanism" by which petitioner Lin could move for remand to the BIA to consider the Guo documents; the Tian Ming Lin panel thus denied the motion. 473 F.3d at 52.

The panel nevertheless granted the relief for which Lin had moved, and remanded to the BIA. The Court did not order the taking of additional evidence; rather, it remanded "for further proceedings consistent with this opinion," and stated that the basis for the remand was that "both parties ask[ed] us to remand." Id. at 54-55. In extensive dicta, however, the Tian Ming Lin panel offered two alternative bases for its decision: [i] remand was appropriate because the government requested a remand, id.; or [ii] remand was

12

appropriate because we have "inherent equitable power to remand cases to administrative agencies for further proceedings in sufficiently compelling circumstances." Id. at 52; see also id. at 54-55. We are unlikely ever to decide whether we have inherent power to remand for consideration of the Guo documents, and, if so, whether we retain that power in the face of the government's opposition to a remand--the government has been consenting to remand in those cases by stipulation. But since the government has not stipulated to a remand in Ni's case, we consider whether we can remand for consideration of the Chen documents as an exercise of our inherent power.

**IV**

As set out above, the Guo documents are not material to claims by Ni, who has had a single child. However, the Chen documents--documents in the record of Jin Xiu Chen v. U.S. Dep't of Justice, 468 F.3d 109 (2d Cir. 2006)--could bear more directly on Ni's claims. The petitioner in Chen submitted "a document that purport[ed] to be a translation of a 1995 missive from the 'Changle City Family Planning Policy Leading Team,'" that states: [i] "that individuals in

13

. . . marriages . . . below the statutory age of marriage . . . who have a child 'must undergo sterilization after the first childbirth'"; [ii] "that unmarried women 'with [a] history of giving childbirth [sic], no matter the number of childbirth[s] she had before, . . . must comp[ly] with the sterilization policy'"; and [iii] "that '[t]hose subjects who gave out-of-plan birth must be imposed with [sic] sterilization operation.'" Id. at 112. If these Chen documents are authentic, and if the 1995 policies described therein remain in force, they may be relevant to the question of whether Ni would face forced sterilization if she were to return to Fujian Province. See id. (noting that the BIA has yet to "consider the authenticity, scope, and import of the 1995 Changle City document").

Ni has not moved in this Court for a remand to the BIA to consider the Chen documents; but as Tian Ming Lin makes clear, Ni lacks a procedural means to make that motion and we lack the statutory authority to grant it. Furthermore, the government does not stipulate to a remand in this case, as it did in Tian Ming Lin. Without the consent of the parties as an available basis for remand, we are confronted with the question left open by Tian Ming Lin: whether,

14

despite the revocation of § 2347(c), we have the inherent equitable power to remand to the BIA and order the taking of additional evidence that was not submitted to the agency and that purports to establish the existence of a policy of forced sterilization that may apply to the petitioner.  This is something of an odd question.  As the Supreme Court has observed:

> "[I]t would be a strange rule . . . which deprived a judge of power to do what was asked when request was made by the person most concerned, and yet allowed him to act without petition," and such an arrangement "would almost certainly subject trial judges to private appeals or application by counsel or friends of one convicted."

Carlisle v. United States, 517 U.S. 416, 422 (1996) (quoting United States v. Smith, 331 U.S. 469, 474, 475 (1947)).  Nevertheless, this question is presented by circumstance, and we proceed to answer it.

**V**

"When Congress established the lower federal courts and vested them with the 'judicial Power of the United States,' U.S. Const. art. III, § 1, . . . [t]he 'judicial Power' consisted of all the inherent powers of the courts of justice necessary to their functioning . . . ."  Armstrong

15

v. Guccione, 470 F.3d 89, 103 (2d Cir. 2006); see also United States v. Hudson, 11 U.S. (7 Cranch) 32, 34 (1812) ("Certain implied powers must necessarily result to our Courts of justice from the nature of their institution.").

However, "[t]he lower federal courts are creatures of statute." Armstrong, 470 F.3d at 102. As such, their "jurisdiction is defined by written law, [and] cannot transcend that jurisdiction." Ex parte Bollman, 8 U.S. (4 Cranch) 75, 93 (1807). "[T]he power which congress possess[es] to create Courts of inferior jurisdiction, necessarily implies the power to limit the jurisdiction of those Courts to particular objects . . . ." Hudson, 11 U.S. (7 Cranch) at 33. Accordingly, even where lower federal courts possess inherent power, "the exercise of [that power] can be limited by statute and rule." Chambers v. Nasco, Inc., 501 U.S. 32, 47 (1991).

We will not, however, "'lightly assume that Congress has intended to depart from established principles,' such as the scope of a court's inherent power." Id. at 47 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982)). "For Congress to displace or repudiate the lower federal courts' inherent powers, the Supreme Court has demanded

16

something akin to a clear indication of legislative intent." Armstrong, 470 F.3d at 102. It is not enough for Congress to pass a statute that expressly grants power that is coextensive with the courts' already existing inherent power. Chambers, 501 U.S. at 49 ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."). Therefore, "it is possible for statutory and inherent sources of judicial authority to coexist." Armstrong, 470 F.3d at 102. And the subsequent revocation of a coextensive statutory grant of power does not necessarily act to circumscribe the courts' inherent power that preexisted the statutory grant. Cf. INS v. St. Cyr, 533 U.S. 289, 310 (2001) (holding that the repeal of a statute "cannot be sufficient to eliminate what it did not originally grant"); Ex parte Yerger, 75 U.S. (8 Wall) 85, 104-05 (1868) (interpreting Congress's repeal of an act to affect only the jurisdiction conferred by that act).

**VI**

The enactment of IIRIRA altered our power to review orders of removal: we "may not order the taking of additional evidence under section 2347(c) of Title 28." 8

17

U.S.C. § 1252(a)(1).  Neither § 2347(c) nor IIRIRA mentions a court's <u>inherent power</u>; so if there existed such an inherent power to order the taking of additional evidence, the enactment of § 2347(c) would not operate to displace it, and the subsequent limitation of § 2347(c) would not operate to limit it--though an argument could be made to the contrary.[2]

"[T]he [inherent] power of courts over their own officers, or to protect themselves, and their members, from being disturbed in the exercise of their functions" is long established.  <u>Ex parte Bollman</u>, 8 U.S. (4 Cranch) 75, 94 (1807).  This inherent power generally extends only to a court's management of its own affairs:  to impose decorum, to maintain order, to control admission to the bar, to discipline attorneys, to punish for contempt, and to vacate its own judgments if tainted by fraud.  <u>Chambers</u>, 501 U.S. at 43-44; <u>see also</u> <u>Degen v. United States</u>, 517 U.S. 820, 823 (1996) ("Courts . . . have certain inherent authority to

_____

[2] IIRIRA also states: "Judicial review of a final order of removal . . . is governed <u>only</u> by chapter 158 of Title 28."  8 U.S.C. § 1252(a)(1) (emphasis added).  The use of the word "only" could be read to evince a congressional intent to strip us of any inherent power in the course of reviewing orders of removal.  However, for the reasons explained below, we need not reach that question.

18

protect their proceedings and judgments in the courts of discharging their traditional responsibilities.").

The inherent power posited by the <u>Tian Ming Lin</u> panel has nothing to do with a court's own affairs; the power supposed is "the inherent equitable power to remand cases to administrative agencies for further proceedings in sufficiently compelling circumstances," 473 F.3d at 52, "for consideration of new evidence," <u>id.</u> at 53. A remand to an administrative agency instructing the agency to reopen the record and take additional evidence is not the management of a court's own affairs, and the Supreme Court has rejected assertions of inherent power that are "remote from what courts require in order to perform their functions." <u>Kokkonen v. Guardian Life Ins. Co. of Am.</u>, 511 U.S. 375, 380 (1994); <u>cf. Ex parte Bollman</u>, 8 U.S. (4 Cranch) at 94 (stating "the power of taking cognizance of any question between individuals, or between the government and individuals" must be "given to this court" by a "statute compatible with the constitution of the United States"). We therefore conclude that, though we have some inherent powers, <u>see, e.g.</u>, <u>Chambers</u>, 501 U.S. at 43-44, it is not immediately obvious that we have the inherent power

suggested by the Tian Ming Lin panel.

In support of its assertion of power, the Tian Ming Lin panel relied exclusively on a passage in Ford Motor Co. v. NLRB, 305 U.S. 364 (1939). See 473 F.3d at 52-53. However, Ford Motor Co. is not as useful an analog as the Tian Ming Lin panel would have it.

The procedural posture of Ford Motor Co. is as follows: After the NLRB ordered Ford to "desist from described practices and to offer reinstatement, with back pay, to certain discharged employees," 305 U.S. at 366, the NLRB moved in the court of appeals "seeking the enforcement of its order," id., while Ford instituted its own action "asking the court [of appeals] to review and set aside the [NLRB's] order." Id. at 367. The Supreme Court considered these parallel proceedings "essentially one" proceeding, because they both hinged on "the legality of the [NLRB]'s order." Id. at 370; see also id. at 369 ("[T]he jurisdiction of the Circuit Court of Appeals is of the same character and scope in a proceeding for review brought by a person aggrieved by an order of the Board as the jurisdiction which the court has in a proceeding instituted by the Board . . . ."). The NLRB moved to withdraw its

20

enforcement action and "remand th[e] cause to the [NLRB] for the purpose of setting aside its findings and [the initial] order." Id. at 367. The court of appeals granted the motion, and the Supreme Court held that the court of appeals had jurisdiction to do so.

In so holding, the Supreme Court used the following language, upon which the Tian Ming Lin panel relied:

> It is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be supplied. . . . The jurisdiction to review the orders of the [NLRB] is vested in a court with equity powers, and while the court must act within the bounds of the statute and without intruding upon the administrative province, it may adjust its relief to the exigencies of the case in accordance with the equitable principles governing judicial action.

Id. at 373; see also Tian Ming Lin, 473 F.3d at 52-53 (quoting the above passage).

The Supreme Court reasoned that "[t]he statute with respect to a judicial review of orders of the [NLRB] follows closely" the statute governing judicial review of Federal Trade Commission orders, under which "it [was] well established that the court may remand the cause to the Commission for further proceedings to the end that valid and

21

essential findings may be made."[3]  Ford Motor Co., 305 U.S. at 373.  Moreover, there was no dispute that, under the governing statute, the court of appeals "could have remanded the cause for further proceedings" if the motion had been made by the petitioner.  Id. at 372.  Accordingly, the question was: given that the court of appeals had jurisdiction to set aside the NLRB's findings, did the court of appeals have jurisdiction to permit the NLRB to set aside its own findings on its own motion without confessing error.  Id. at 374-75.  The Court held that it did.  Id. at 375.

Ford Motor Co. may not support the proposition that we have inherent power to remand and order the reopening of the record for the taking of additional evidence, in compelling circumstances or otherwise;[4] rather, it may suggest that the

---

[3] The Court relied on FTC v. Curtis Publishing Co., 260 U.S. 568, 580 (1923), in support of this proposition concerning orders of the Federal Trade Commission.  See Ford Motor Co., 305 U.S. at 373.  Curtis makes clear that the relevant "statute grants jurisdiction to make and enter . . . a decree affirming, modifying or setting aside an order," 260 U.S. at 580.  The power inferred by the Curtis Court was the power to "examine the whole record and ascertain for itself the issues presented and whether there are material facts not reported by the commission."  Id. (emphasis added).  The Court inferred no inherent power to examine evidence outside the record, or an inherent power to order the Federal Trade Commission to do so.

[4] The two circuit court opinions cited in Tian Ming Lin also fail to provide any meaningful support.  See 473 F.3d

22

scope of our inherent power to remand might depend upon the request of the government.[5] Nevertheless, a remand compelling the BIA to reopen the record would be hard to square with the post-IIRIRA statutory framework.

On the other hand, we cannot and should not attribute dispositive weight to the government's stipulation to a remand. Rule 42(b) of the Federal Rules of Civil Procedure provides that "[t]he circuit clerk may dismiss a docketed appeal if the parties file a signed dismissal agreement . . . . [but n]o mandate or other process may issue without a court order." (emphasis added). Thus, as we explained in Khouzam v. Ashcroft, "[a]lthough the parties are free to agree to a dismissal on their own, Federal Rule of Appellate

---

at 52-53. In a pre-IIRIRA case, the Tenth Circuit stated that Ford Motor Co. established an inherent power to remand, but the statement was dicta and unaccompanied by any discussion. See Becerra-Jimenez v. INS, 829 F.2d 996, 1001-02 (10th Cir. 1987). The District of Columbia Circuit has (in a footnote) read Ford Motor Co. to permit "a remand in the absence of reversal," but not the exercise of broad inherent powers asserted by the Tian Ming Lin panel. See Greater Boston Television Corp. v. FCC, 463 F.2d 268, 283 n.26 (D.C. Cir. 1971).

[5] While we no longer have the power to "order the taking of additional evidence under" § 2347(c), 8 U.S.C. § 1252(a)(1), the Attorney General can withdraw an order of the BIA for further review, thus depriving us of jurisdiction. See 8 C.F.R. § 1003.1(h)(1)(i); Ren v. Gonzales, 440 F.3d 446, 448-49 (7th Cir. 2006).

23

Procedure 42(b) does not mandate that an appellate court issue an order simply because the parties agree to it." 361 F.3d 161, 167 (2d Cir. 2004).[6]

Still, we cannot imagine all possible circumstances that might arise in future cases, and we therefore decline to forswear categorically all inherent power to remand for additional fact-finding in agency cases that present extraordinary and compelling circumstances.[7] Rather, we conclude that the exercise of such an inherent power is not warranted if, as here: [i] the basis for the remand is an

---

[6] In certain circumstances, the Supreme Court has seen fit to remand cases to state courts for the further development of the record, without mention of the consent of either party. See Villa v. Van Schaick, 299 U.S. 152, 155 (1936); Gulf, Colo., & Santa Fe Ry. Co. v. Dennis, 224 U.S. 503, 507 (1912).

[7] For example, a remand for additional fact-finding may be necessary in cases where "a fraud has been perpetrated upon the court," or "'to set aside fraudulently begotten judgments.'" Chambers, 501 U.S. at 44 (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245 (1944)). Such a remand and order would fall within a court's power to manage its own affairs. Id. at 43. In Massachusetts Bay Telecasters, Inc. v. FCC, 261 F.2d 55 (D.C. Cir. 1958), and WORZ, Inc. v. FCC, 268 F.2d 889 (D.C. Cir. 1959), the Court of Appeals for the District of Columbia took judicial notice of congressional testimony that caused the Court to suspect that the agency determination under review was tainted by "misconduct" and "[i]mproper influence" that went to the "very core" of the FCC's judicial function. Mass. Bay Telecasters, 261 F.2d at 67. The Court therefore remanded and ordered that the FCC reopen the record and consider evidence of misconduct.

instruction to consider documentary evidence that was not in the record before the BIA; and [ii] the agency regulations set forth procedures to reopen a case before the BIA for the taking of additional evidence.

**VII**

"Because of their very potency, inherent powers must be exercised with restraint and discretion." Chambers, 501 U.S. at 44.  The existence of evidence that was not in the record before the BIA (and therefore was not examined by the BIA) does not present a sufficiently compelling situation to warrant the exercise of inherent power to order the taking of additional evidence.  Nor are these circumstances "unusual," Tian Ming Lin, 473 F.3d at 54; nothing is easier than to submit to an appellate court for the first time documents that, "if authentic," would "appear to be official statements" of the Chinese government.  Id. at 51.  If not these documents or those documents, some others would do.

The test proposed by the Tian Ming Lin panel is to remand for the taking of additional evidence if there are "sufficiently compelling circumstances."  Id. at 52. Evidence may be "compelling" if it is authentic, but we are

25

in no position to make such a determination. According to the Tian Ming Lin dicta, all that is needed is to "notice only that another panel of our Court remanded a case to the BIA for reconsideration of previously unexamined evidence that, in the opinion of that panel, 'apparently reflects governmental policy'" regarding forced sterilization. Id. at 52. But a prior panel's remand based on unexamined but potentially material evidence that was in the record of that case does not establish that the evidence is "compelling," much less that it is "sufficiently compelling" to warrant remand for consideration of that evidence in other cases; it merely establishes the unremarkable proposition that a remand is appropriate when the BIA fails to consider potentially material evidence that was in the record before it. See Shou Yung Guo, 463 F.3d at 115.

More fundamentally, the agency regulations provide an avenue for the reopening of proceedings, and specify conditions and parameters that amount to a set of standards for what is compelling and what is not. Thus, a person in Ni's position is afforded an opportunity to move to reopen proceedings before the BIA. The motion may be granted if [i] the petitioner presents new evidence that "is material

26

and was not available and could not have been discovered or presented at the former hearing," 8 C.F.R. § 1003.2(c)(1); [ii] the motion is filed within ninety days of the final administrative decision, id. § 1003.2(c)(2); and [iii] the petitioner has not already filed a motion to reopen, id. These "time and numerical limitations" do not bar a motion to reopen if it is "based on changed circumstances arising in the country of nationality or in the country to which deportation has been ordered." Id. § 1003.2(c)(3). In deciding the motion to reopen, the BIA can evaluate the petitioner's new evidence, and determine its import in the first instance. If the motion is denied under such circumstances that the BIA was compelled to grant it, a petition may be taken to this Court, and this Court can grant relief--without calling upon extraordinary inherent powers. See, e.g., Hasirah v. Dep't of Homeland Security, 478 F.3d 474, 476-77 (2d Cir. 2007) (per curiam) ("We review the denial of a motion to reopen a removal proceeding for abuse of discretion.").

"Principles of deference counsel restraint in resorting to inherent power, and require its use to be a reasonable response to the problems and needs that provoke it." Degen,

27

517 U.S. at 823-24 (internal citations omitted). "A court's inherent power is limited by the necessity giving rise to its exercise." Id. at 829. Where, as here, existing statutes and regulations provide an "alternative means of protecting the [petitioner's] interests," and say when and how the record may (and may not) be reopened, there is "a lack of necessity," id. at 827, for the resort to inherent powers.[8]

The ability of a particular petitioner to successfully reopen proceedings in the agency does not bear on the question. It therefore does not matter whether the BIA would grant a hypothetical motion to reopen filed by Ni at some future time. The question is whether we should exercise some inherent power to remand to the BIA and order the taking of additional evidence when the BIA itself has not had the opportunity to consider the evidence in the

---

[8] One of our colleagues has argued that even where inherent power is unquestionably available (e.g., our contempt power), provisions that regulate the exercise of overlapping statutory power "should be a presumptive benchmark" for the exercise of the inherent power. Armstrong, 470 F.3d at 113 (Sotomayor, J., concurring). It would then follow that if inherent power existed to remand for a reopening of the record in the BIA, the regulations governing motions to reopen would be a presumptive benchmark for deciding whether the circumstances presented were sufficiently compelling to justify use of inherent powers to do approximately the same thing.

context of the petitioner's case. The mere opportunity to file a motion to reopen means that regardless of the disposition in this Court, a petitioner has the ability to put additional evidence before the agency, and the agency will consider whether to reopen proceedings in light of that evidence. If the agency grants the motion, then the need for this Court to review its decision is eliminated. If the agency denies the motion based on a determination that the evidence is either immaterial or fraudulent, then we can review that decision on a full record, which would include the relevant evidence. If the agency denies the motion based on a determination that the motion is untimely or otherwise procedurally barred, see 8 C.F.R. § 1003.2(c), then we can review that decision as well. But our power (inherent or otherwise) to review that decision is unrelated to any inherent power to remand and order the taking of additional evidence, which would be unnecessary in such a case, because the relevant evidence would have been in the record before the BIA on the motion to reopen proceedings.[9]

---

[9] The concurrence suggests that two observations are "all that is needed to decide the case," concurring op. at 4: that [i] Ni "may very well" be able to reopen the proceedings in the agency, id. at 2-3, and [ii] it is "more than plausible" that Ni will be able to file another asylum application, id. at 3-4. But that is sheer speculation. We

**VIII**

Neither Hoxhallari v. Gonzales, 468 F.3d 179 (2d Cir. 2006), nor Latifi v. Gonzales, 430 F.3d 103 (2d Cir. 2005), (both cited in Tian Ming Lin, 473 F.3d at 51) are to the contrary.  In Latifi, we remanded due to numerous errors in the IJ's adverse credibility finding as to the Albanian petitioner.  430 F.3d at 105-06.  In a closing footnote, we recognized that "the Democratic Party returned to power in Albania."  Id. at 106 n.1.  But this observation was not the basis for our remand; we did no more that suggest that the BIA "may wish to consider this event," and that the government had "the burden of showing the significance, if any, of the change in power."  Id.

In Hoxhallari, we upheld an IJ's conclusion that changed country conditions in Albania defeated the petitioner's presumption of future persecution.  468 F.3d at

hold that the exercise of inherent power does not depend on the prevailing odds of success for hypothetical motions that may or may not ever be filed with the agency.  The concurrence concedes that inherent powers should not be exercised unless "there is no other way to correct manifest injustice."  Id. at 1.  But even if "manifest injustice" triggered an inherent power, we cannot know whether our failure to exercise such power would lead to any particular outcome (just, unjust, or manifestly unjust) unless and until the BIA has had an opportunity to review a specific request for relief.

184-87.  While the IJ's discussion of the changed conditions was "perfunctory," the IJ "recognized th[e] political transformation" occurring in Albania.  See id. at 183, 185.  We concluded that this recognition was sufficient, and did not require a "detailed [and] specific" recitation of country conditions, id. at 187, because we assumed that the IJ was aware of "the salient historical events and conditions of countries that are the subject of an appreciable proportion of asylum claims," id. at 186.

Thus, these cases stand for the uncontroversial propositions that [i] this Court is not ignorant of indisputable historical events (such as the partition of India, the break-up of the Ottoman Empire, or the fall of Communist regimes in the Balkans), and [ii] we will not assume that the agency suffers from such ignorance.  Neither proposition has any import here.

* * * * *

For the reasons set forth above, the petition is hereby denied.

31

CALABRESI, *Circuit Judge*, concurring:

I concur in the result. There is much in the majority opinion with which I agree, as to matters both central and peripheral to its decision. In the latter category, I find very helpful, for instance, the majority's treatment of *Latifi* and *Hoxhallari*. *Latifi v. Gonzales*, 430 F.3d 103 (2d Cir. 2005) (per curiam); *Hoxhallari v. Gonzales*, 468 F.3d 179 (2d Cir. 2006) (per curiam); *see* maj. op. at 30-31.

More centrally, like the majority, I believe that the question of whether we have inherent equitable power to remand for additional fact-finding, given the removal of our statutory authority to do so, is not yet fully resolved. 8 U.S.C. § 1252(a)(1). There are clearly strong feelings on that question. *See Tian Ming Lin v. U.S. Dep't of Justice*, 473 F.3d 48 (2d Cir. 2007) (per curiam); maj. op. at 15-25. And, as the majority opinion says, one should be hesitant to assume the nonexistence or the casual statutory abrogation of any such inherent equitable powers. Maj. op. at 16-17. I fully concur with the majority, however, that such inherent equitable powers, if they exist, should be exercised only very sparingly, for example, where there is no other way to correct manifest injustice. Moreover, in the case before us,

32

I think it obvious that, at least at this time, no manifest injustice will result from our decision not to remand to the BIA.

Broadly speaking, the petitioner may have two alternative avenues for relief.

First, she has the option of asking the BIA to reopen the original proceedings. 8 C.F.R. § 1003.2. Normally, a motion to reopen must be filed within ninety days of the Board's decision, 8 C.F.R. § 1003.2(c)(2), but this time limit does not apply to petitioners relying on new evidence of changed country conditions, where that evidence could not have been discovered or presented at the original hearing. 8 C.F.R. § 1003.2(c)(3)(iii).[1] The documents proffered by the petitioner in *Chen* – if valid – may very well establish changed country conditions. *Jin Xiu Chen v. U.S. Dep't of Justice*, 468 F.3d 109 (2d Cir. 2006) (per curiam). And even if the *Chen* documents themselves describe conditions which predate Ni's petition, they may represent the "equivalent of changed country conditions notwithstanding the date of their issuance[] . . . because they might vary the perception of

---

[1] While the decision to grant or deny a motion to reopen remains within the BIA's discretion, 8 C.F.R. 1003.2(a), as the majority points out, this court can review that decision for abuse of discretion. *See* maj. op. at 27; *Ke Zhen Zhao v. U.S. Dep't of Justice*, 265 F.3d 83, 93 (2d. Cir 2001).

33

the State Department, upon which the immigration courts rely, which would warrant reopening under 8 C.F.R. § 1003.2(c)." *Fong Chen v. Gonzales*, No. 06-1010, 2007 U.S. App. LEXIS 13897, at *10 (2d Cir. June 14, 2007).

Second, the regulations seem to permit the petitioner to make a new request for asylum. The statute allows a repeat application based on changes that have occurred since the original application was denied, if these changed circumstances "materially affect [her] eligibility for asylum." 8 U.S.C. § 1158(a)(2)(D). This provision apparently includes changed personal conditions as well as changed country conditions. *See* 8 C.F.R. § 208.4(a)(4)(i); *Jian Huan Guan v. BIA*, 345 F.3d 47, 49 (2d Cir. 2003) (per curiam); *Ai Ming Dong v. U.S. Dep't of Justice*, No. 05-5994, 2007 U.S. App. LEXIS 4693, at *3-4 (2d Cir. Feb. 26, 2007). The subsequent discovery of the *Chen* documents may well constitute such changed circumstances.

A petitioner, like Ni, must file her new request within a "reasonable period," but in deciding whether she has done so, the authorities are obliged to consider the fact that the changed circumstances were only discovered long after her original request was denied. 8 C.F.R. § 208.4(a)(4)(ii).

34

It seems more than plausible, then, that Ni, even if she could not reopen before the BIA, could present a new asylum petition. Her claim of persecution would, as a result, be heard on its merits.

Given these possibilities, it seems to me quite clear that – in this case, at this time – no exercise of inherent equitable powers is called for to prevent manifest injustice. Since that is all that is needed to decide the case, I fully agree that the petition must be denied without determining whether or not we have such inherent equitable powers to remand.

As to most of the interesting, learned and often useful dicta in the majority opinion, I express no ultimate view. There is, however, one implication in the opinion which is dicta and with which I expressly disagree. The opinion states that "[w]here . . . existing statutes and regulations provide an 'alternative means of protecting the [petitioner's] interests,' . . . . there is 'a lack of necessity' for the resort to inherent powers." Maj. op. at 28 (second alteration in original) (citation omitted). The opinion then adds that "[t]he ability of a particular petitioner to successfully reopen proceedings does not bear

35

on the question." *Id.* This language could be taken to mean that the mere existence of a procedure which permits some petitioners to have their cases heard by the BIA, but excludes others, would be sufficient to bar the exercise of any inherent equitable powers we have, even when the excluded applicants would suffer manifest injustice.

If that is what the majority means to say,[2] this dictum strikes me as wrong and, indeed, self-contradictory. If the reason we have inherent equitable powers at all is that courts are not readily deprived of the power to remand to correct manifest injustice, then those powers must be

---

[2] I am not sure that the majority intends to go this far. There is language in the opinion that suggests no more than that inherent equitable powers ought not to be used when an alternative procedure is seemingly available, until it turns out that the procedure was not in fact available to the particular petitioner. I read footnote 9 of the majority opinion to suggest that an exercise of inherent powers – if we have them – might be justified when and if the agency has closed all other doors to hearing a potentially meritorious claim. But there is other language that could be read as more absolute.

In any event, while the majority is correct in footnote 9 when it says that whether various doors that are plausibly open to petitioner are in fact open can only be "speculation," that does not end the matter. The presence of those possibilities is enough to justify us in not exercising inherent powers at this time. At this moment, no manifest injustice would result from our abstention. It is only if alternative routes turn out in fact not to be available that the issue of exercise of inherent powers would become ripe for decision.

available, whether the injustice is due to the total absence of procedures, or instead results from the presence of procedures so circumscribed that they would lead to manifest injustice to a particular petitioner who comes to our court. In any event, since adequate procedures do seem to be available to Ni, none of this is determinative of the case before us.

* * * * *

Because I agree that if we have inherent powers, they must be used very sparingly, essentially only in cases of manifest injustice; and because in the instant case procedures are seemingly available to avoid any such injustice at this time, I agree with the majority that we should not remand, and I concur in the result.